Richard W. SCHOON, Plaintiff Below–Appellant,

v.

Daryl D. SMITH, John F. Beckert, Mark C. Gwillim, Conrad A. Plimpton, and Troy Corporation, a Delaware Corporation, Defendants Below–Appellees.

No. 554, 2006.

Supreme Court of Delaware.

Submitted: Nov. 28, 2007.
Decided: Feb. 12, 2008.

Kevin G. Abrams, Esquire, J. Travis Laster, Esquire (argued), and A. Thompson Bayliss, Esquire, of Abrams & Laster LLP, Wilmington, Delaware for Appellant.

Michael A. Weidinger, Esquire (argued) and Patricia R. Uhlenbrock, Esquire, of Morris James, LLP, Wilmington, Delaware; Michael J. Maimone, Esquire, and Paul D. Brown, Esquire, of Edwards Angell Palmer & Dodge LLP, Wilmington, Delaware for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice.

Appellant Richard W. Schoon is a director, but not a stockholder, of Troy Corporation, a privately held Delaware corporation. He filed a derivative action in the Court of Chancery on behalf of Troy, alleging breaches of fiduciary duties by his fellow directors. Schoon argued below that his role as a fiduciary to the corporation should permit him to have the same standing a stockholder has to bring a derivative action. The Court of Chancery dismissed his complaint.

Schoon argues on appeal that this Court should hold that a director has the right to bring a derivative action for the same reasons that equity has traditionally granted stockholders the right to do so. He contends that an extension of standing to a director will promote Delaware public policy. In this Opinion, we examine the traditional common law of standing and equity's historic role in granting standing to stockholders to bring a derivative action on behalf of a corporation to prevent a complete failure of justice. Although the Delaware General Assembly has the prerogative to confer standing upon directors by statute, it has not chosen to do so. Because a stockholder derivative action is available to redress any breach of fiduciary duty, we decline to extend the doctrine of equitable standing to allow a director to bring a similar action. Accordingly, we affirm the judgment of the Court of Chancery.

### Facts and Procedural Background

Troy Corporation is a privately held Delaware corporation whose capital structure consists of three series of common stock. Series A shares are entitled to elect four of the five Troy directors. Daryl Smith, the CEO and Chairman of Troy, owns a majority of the Series A shares, which he voted to elect himself and three others to the board of directors. Series B stockholders have the right to elect the final member of the board. Another privately held Delaware Corporation, Steel, owns a majority of Series B shares, which it voted to elect Schoon, who owns no stock in Troy, to the Troy board of directors. Series C shares have no voting rights.

Schoon alleges that shortly after he became a director of Troy, he discovered that the other three board members were "beholden to Smith," which enabled Smith to dominate and control the board. Schoon alleges that Smith has taken actions on several occasions that were designed to entrench himself in power and, in turn, thwart potential value-maximizing transactions for the benefit of Troy and its stockholders.

Schoon claims in his complaint that none of the directors, other than he, is able to exercise independent judgment regarding Smith or Troy. He alleges that Troy is

being injured by the actions of his fellow directors and that his boardroom attempts to save the corporation from their breaches of fiduciary duties have been thwarted by Smith's dominance. In response to Schoon's complaint, the defendants moved to dismiss his complaint for lack of standing.

The Court of Chancery, relying on 8 *Del. C.* § 327, Court of Chancery Rule 23.1, and *Moran v. Household International, Inc.*,[1] concluded that "Delaware law does not recognize the right of a director, acting in that capacity, to sue on behalf of the corporation he or she serves or on behalf of its stockholders." The Vice Chancellor noted that "[t]here are powerful policy interests embodied in both Section 327 of the Delaware General Corporation Law and Court of Chancery Rule 23.1 that militate against recognizing the standing of an individual director to bring such litigation. Any decision to alter those arrangements is properly left to the collective judgment of the General Assembly." Consequently, the Vice Chancellor dismissed Schoon's complaint for lack of standing. This appeal followed.

## Schoon's Contentions and Our Standard of Review

Schoon argues that as a matter of equity and public policy, a director should be entitled to assert a derivative claim on behalf of the corporation for the same reasons that stockholders are permitted to do so. He urges that equipping directors

with standing to sue derivatively is consistent with the fiduciary duties of directors and "promotes the core Delaware public policy of protecting against misconduct by faithless fiduciaries." Because the Court of Chancery's decision on director standing implicates rulings of law, we review it *de novo.*[2]

## Standing and the Rationale for Equitable Standing of Stockholders

"Standing is the requisite interest that must exist in the outcome of the litigation at the time the action is commenced."[3] We have previously explained the concept:

The concept of "standing," in its procedural sense, refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance. It is concerned only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy. In order to achieve standing, the plaintiff's interest in the controversy must be distinguishable from the interest shared by other members of a class or the public in general. Unlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are "mere intermeddlers."[4]

1. 490 A.2d 1059, 1071 (Del.Ch.), *aff'd,* 500 A.2d 1346 (Del.1985).

2. *See Rosenbloom v. Esso V.I., Inc.*, 766 A.2d 451, 458 (Del.2000).

3. *Gen. Motors Corp. v. New Castle County,* 701 A.2d 819, 823 (Del.1997). *See also In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203, at *9 (Del.Ch.) ("The primary purpose of standing is to ensure the plaintiff has

suffered a redressable injury.") (citation and internal quotation marks omitted).

4. *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del.1991) (citations omitted). *See also Dover Hist. Soc. v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) ("Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is

The traditional concept of standing confers upon the corporation the right to bring a cause of action for its own injury.

█ The equitable standing of a stockholder to bring a derivative action on behalf of a corporation has long been grounded upon the interests of justice. In England, the "possibility of abuse of [the corporation's] concentration of managerial power had been recognized and corrective efforts of a legal nature had appeared" as early as 1307.[5] By the time of the English Industrial Revolution, "[t]he multiplication and dispersion of membership made impossible obstacles of ordinary rules relating to parties."[6] Likewise, by the time of the American Industrial Revolution, "the individual stockholder was in need of a means of invoking judicial power to curb managerial abuse."[7]

To prevent "a failure of justice,"[8] courts of equity granted equitable standing to stockholders to sue on behalf of the corporation "for managerial abuse in economic units which by their nature deprived some participants of an effective voice in their administration."[9] The courts reasoned that without equitable standing, "stockholders would be without any immediate and certain remedy," there would have been a complete failure of justice, and the general principles of equity and fairness would have been defeated.[10] Today, the result of this judicially-created doctrine is known as the stockholder derivative action.

a 'case or controversy' that is appropriate for the exercise of the court's judicial powers.").

5. Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on its Derivation*, 32 N.Y.U. L. REV. 980, 981 (1957). Prunty also traces the modern doctrine that "all corporate managers were to be held to the fiduciary responsibilities of trustees and that appropriate enforcement procedures would be devised" to the case of *The Charitable Corporation v. Sutton*, 2 Atk. 400, 26 Eng. Rep. 642 (Ch. 1742). *Id. See also* 1 STORY'S EQUITY JURISPRUDENCE 27–49 (Isaac F. Redfield, ed., 9th ed. 1866) (providing a brief overview of the origin and history of equity in England and how the American courts adopted it) [STORY]; SCHNELL'S PRINCIPLES OF EQUITY 5–9 (R.E. Megarry & P.V. Baker, eds., 24th ed. 1954) (providing a succinct discussion of the origins, developments, and procedural reforms of equity in England) [SCHNELL].

6. Prunty, *supra* note 5, at 982.

7. *Id.* at 986.

8. 4 POMEROY'S EQUITY JURISPRUDENCE § 1095, at 277 (5th ed. 1941) [4 POMEROY].

9. Prunty, *supra* note 5, at 994. *See also id.:*
The derivative idea resulted from attempts, eventually successful, to extend the shareholders' right beyond the management group to recognition against extracorporate defendants.

For this purpose[,] trust law was inadequate in its then state of development. To span the difficulty, the derivative concept was forged through the union of the concepts of corporate entity and breach of trust. Both were necessary. Without the breach of trust the shareholder had no litigable complaint against the administration of affairs by his appointed representatives. Without the corporate entity the shareholder could invoke no trust doctrine recognizing a right of substitution in the enforcement of aggregate legal rights.

10. 4 POMEROY, *supra* note 8, § 1095, at 276. *See also id.:*
Although the corporation holds all the title, legal or equitable, to the corporate property, and is the *immediate cestui que trust* under the directors with respect to such property, and is theoretically the only proper party to sue for wrongful dealings with that property, yet courts of equity recognize the truth that the stockholders are *ultimately* the only beneficiaries; that their rights are really, though indirectly, protected by remedies given to the corporation; and that the final object of suits by the corporation is to maintain the interests of the stockholders.

■ As "a creature of equity,"[11] the derivative action has generally served as a vehicle to enforce a corporate right.[12] There has been a singular purpose for this grant of equitable standing to a stockholder:

> The stockholder does not bring such a suit because *his* rights have been *directly* violated, or because the cause of action is *his*, or because *he* is entitled to the relief sought; he is permitted to sue in this manner *simply in order to set in motion the judicial machinery of the court....* In fact, the plaintiff has no such *direct* interest; the defendant corporation alone has a direct interest; the plaintiff is permitted, notwithstanding his want of interest, to maintain the action *solely to prevent an otherwise complete failure of justice.*[13]

■ Our courts have consistently recognized this nature of the derivative suit.[14] As we have acknowledged, "[t]he right of a stockholder to file a bill to litigate corporate rights is, therefore, solely for the purpose of preventing injustice where it is apparent that material corporate rights would not otherwise be protected."[15] Similarly, the Court of Chancery has noted:

> The derivative action was developed by equity to enable stockholders to sue in the corporation's name where those in control of the corporation refused to assert a claim belonging to the corporation. The nature of the derivative suit is two-fold: first, it is the equivalent of a suit by the stockholders to compel the corporation to sue; and second, it is a suit by the corporation, asserted by the stockholders in its behalf, against those liable to it.[16]

**11.** 13 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5940, at 30 (2004).

**12.** R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, 1 THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 13.10, at 13–20 (3d ed. 2008) ("The fundamental purpose of a derivative action is to enforce a corporate right that the corporation has refused for one reason or another to assert.") [BALOTTI & FINKELSTEIN]. *See also Maldonado v. Flynn*, 413 A.2d 1251, 1261 (Del.Ch.1980), *rev'd on other grounds sub nom. Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981):

> The stockholder's derivative suit was created in equity in the first half of the nineteenth century. Its initial purpose was to provide the stockholder a right to call to account his directors for their management of the corporation, analogous to the right of a trust beneficiary to call his trustee to account for the management of the trust corpus. The stockholder's right was therefore individual, although the interest he sought to protect was primarily that of the corporation and only indirectly his own. The stockholder's right to sue was subsequently expanded, during the latter half of the nineteenth century, to permit him to bring suit in limited circumstances against third parties on the corporation's cause of action, when the directors refused to sue.

> This expansion of the stockholder's right went beyond the trust analogy on which the right was originally predicated but the right to assert the corporate cause of action remained individual. (citations omitted)

**13.** 4 POMEROY, *supra* note 8, § 1095, at 278 (final emphasis added); *accord Taormina v. Taormina Corp.*, 78 A.2d 473, 475 (Del.Ch. 1951).

**14.** *See* EDWARD P. WELCH, ANDREW J. TUREZYN, & ROBERT S. SAUNDERS, 2 FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 327 (5th ed. 2008) (providing an in-depth and exhaustive summary of the derivative action in Delaware).

**15.** *Zapata*, 430 A.2d at 784 (quoting *Sohland v. Baker*, 141 A. 277, 282 (Del.1927)).

**16.** *Harff v. Kerkorian*, 324 A.2d 215, 218 (Del. Ch.1974), *aff'd in part, rev'd in part on other grounds*, 347 A.2d 133, 134 (Del.1975). *See also Cantor v. Sachs*, 162 A. 73, 76 (Del.Ch. 1932) ("Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress."). *See also id.:*

## Statutory Restrictions Upon Equitable Standing of Stockholders

Over time, the stockholder derivative action became stigmatized as a "refuge of strike suit artists specializing in corporate extortion." [17] In response, statutes to authorize and regulate this type of action were passed.[18] In Delaware, the General Assembly enacted 8 *Del. C.* § 327, of the Delaware General Corporation Law ("DGCL"), titled "Stockholder's derivative action; allegation of stock ownership." Section 327 provides:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.[19]

■■■ As explained by former Chancellor Seitz, this provision and its predecessor were enacted solely "to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock." [20] Further, "while

> A bill filed by stockholders in their derivative right therefore has two phases—one is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation, asserted by the stockholders in its behalf, against those liable to it. The former belongs to the complaining stockholders; the latter to the corporation. The complaining stockholders are allowed in derivative bills to bring forward these two causes of action in one suit. But any recovery granted by the decree necessarily is in favor of the corporation. The complaining stockholders secure nothing to themselves as individuals, beyond the mere right, which is inherent in the decree for relief to the corporation, of compelling their recalcitrant corporation to accept the relief which the decree affords.

17. Carol B. Swanson, *Juggling Shareholder Rights and Strike Suits in Derivative Litigation: The ALI Drops the Ball,* 77 MINN. L.REV. 1339, 1348 (1993) (quoting 1 ROGER J. MAGNUSON, SHAREHOLDER LITIGATION § 8.01, at 3 (1992)).

18. *See id.;* Prunty, *supra* note 5, at 980.

19. 8 *Del. C.* § 327. Court of Chancery rule 23.1 mirrors this requirement. *See Lewis v. Anderson,* 477 A.2d 1040, 1045 n. 7 (Del. 1984) ("Section 327's requirement that the plaintiff to a derivative suit be a stockholder of the corporation on whose behalf the suit is brought at the time of the transaction complained of is mirrored in Court of Chancery Rule 23.1 . . . ."). In pertinent part, Rule 23.1 reads:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law.

20. *Rosenthal v. Burry Biscuit Corp.,* 60 A.2d 106, 111 (Del.Ch.1948); *accord Anderson,* 477 A.2d at 1046 ("The purpose of such a rule is well established: to eliminate abuses associated with a derivative suit."); *Jones v. Taylor,* 348 A.2d 188, 191 (Del.Ch.1975) ("Turning to the policy behind § 327, it is well recognized that the section was enacted to eliminate strike suits and other abuses which developed along with the derivative suit."); *Maclary v. Pleasant Hills, Inc.,* 109 A.2d 830, 833 (Del. Ch.1954) ("This statute was not passed to prevent the correction of corporate wrongdoing. It was designed principally to prevent the purchasing of stock to be used for the purpose of filing a derivative action attacking transactions occurring prior to such purchase."); *Newkirk v. W.J. Rainey, Inc.,* 76 A.2d 121, 123 (Del.Ch.1950) (noting that the policy of the predecessor statute was also "the prevention of the evil of purchasing stock in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock").

the statute should be construed so as to reasonably effectuate its primary purpose—to discourage a type of strike suit—it should not be construed so as to unduly encourage the camouflaging of transactions and thus prevent reasonable opportunities to rectify corporate aberrations."[21]

Section 327 *"does not create the right to sue derivatively, but rather restricts that right."*[22] The equitable standing of a stockholder to bring a derivative action was judicially created but later restricted by a statutory requirement that a stockholder plaintiff must either have been a stockholder at the time of the transaction of which she complains or her stock must have devolved upon her thereafter by operation of law. The judicial creation of equitable standing for a stockholder to bring a derivative action demonstrates that equitable doctrine can be judicially extended to address new circumstances. Accordingly, we cannot agree with the Court of Chancery's categorical conclusion that "any decision" to extend equitable standing to a director is for the General Assembly to make. That decision is one the judiciary is empowered to make as well. We conclude, however, that there is no reason to do so at this time.

### The Extension of Equitable Doctrine

Historically, equity jurisdiction "has taken its shape and its substance from the perceived inadequacies of the common law and the changing demands of a developing nation."[23] As *Pomeroy's Equity Jurisprudence* states, that is the very nature of equity:

> The true function of precedents is that of illustrating principles; they are examples of the manner and extent to which principles have been applied; they are the landmarks by which the court determines the course and direction in which principles have been carried. But with all this guiding, limiting, and restraining efficacy of prior decisions, the Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within

---

21. *Maclary*, 109 A.2d at 833.

22. *Harff*, 324 A.2d at 218, *aff'd*, 347 A.2d at 134 (emphasis added). This Court has explored some of the restrictions on a stockholder's equitable standing in the context of merging corporations. Under Delaware law, "it is well established that a merger which eliminates a derivative plaintiff's ownership of shares of the corporation for whose benefit she has sued terminates her standing to pursue those derivative claims." *Lewis v. Ward*, 852 A.2d 896, 900–01 (Del.2004) (citing cases). The stockholder loses equitable standing here because the "derivative claims pass by operation of law to the surviving corporation, whose board of directors then has the sole right and standing to prosecute the action." *Id.* at 904. This general rule is the "logical corollary to the established principle of Delaware corporate law recognizing the

separate corporate existence and identity of corporate identities, as well as the statutory mandate that the management of every corporation is vested in its board of directors, not in its stockholders." *Id.* at 903; *accord* 8 *Del. C.* § 141(a); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

23. DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, 1 CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 2–2[a], at 2–2 (2006). *See also* STORY, *supra* note 5, at 19 ("Equity jurisprudence may, therefore, properly be said to be that portion of remedial justice, which is exclusively administered by a court of equity, as contradistinguished from that portion of remedial justice, which is exclusively administered by a court of common law.").

the principles of equity, where a court of law in analogous cases would be powerless to give any relief.[24]

Professor Pomeroy continues: "Although equity is and long has been in every sense of the word a system, and although it is impossible that any new general principles should be added to it, ... the truth stands, and always must stand, that the final object of equity is to do right and justice." [25]

▮▮▮ As this Court has noted, "it is well settled law that the judiciary has the power to overturn *judicially-created doctrine*, so long as that doctrine has not been codified in statute." [26] In discussing common law principles, we have recognized that "[t]he law should be an ever developing body of doctrines, precepts, and rules designed to meet the evolving needs of society." [27] Here, we are dealing with judicially-created equitable doctrine that also has been embodied in a statute.[28] We are asked to exercise our inherent authority to extend the doctrine of equitable standing to include a director at a time when the General Assembly has not spoken on the subject. Judicially-created equitable doctrines may be extended so long as the extension is consistent with the principles of equity.[29] As *Woolley's Delaware Practice* explains:

> It may safely be affirmed that the whole body of equity principles, both of right and remedy, was brought hither by our ancestors, together with the common law, on their emigration from England, as a part of their heritage of liberty. Much of it, no doubt, lay dormant for a long period, no occasion or demand for a resort to portions of it for many purposes having arisen, but gradually as the increasing population of the new country begot new relations, there arose controversies and contests growing out of business, and the necessities for the redress of injuries which resulted from the breach of duties or the non-performance of obligations, that called for the use of the means to enforce observance through ancient remedies.[30]

**24.** 1 POMEROY's EQUITY JURISPRUDENCE § 60, at 77–78 (5th ed. 1941) [1 POMEROY]; *accord* McCLINTOCK ON EQUITY § 4, at 10 (2d ed. 1948) ("[T]he chancellors could adapt their system to meet changing needs without resorting to the fiction that they were merely interpreting and applying former rules, but the tendency to follow the path laid out by former chancellors was strong.") (citations omitted).

**25.** 1 POMEROY, *supra* note 24, § 60, at 80 (emphases omitted).

**26.** *Shea v. Matassa*, 918 A.2d 1090, 1095 (Del. 2007) (quoting *Beattie v. Beattie*, 630 A.2d 1096, 1098 (Del.1993)).

**27.** *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 738 (Del.1983).

**28.** *See generally Glanding v. Indus. Trust Co.*, 45 A.2d 553, 558–559 (Del.1945):

> It cannot be said too forcefully that the general powers of the Court of Chancery refers to that complete system of equity as administered by the High Court of Chancery of Great Britain, and a proper interpretation of the constitutions of this State lead to but one conclusion; that is, that the Court of Chancery shall continue to exercise that complete system of equity jurisdiction in all respects until the Legislature of this State shall provide otherwise, as by granting the exercise of a part of that jurisdiction exclusively to some other tribunal. *See generally* SCHNELL, *supra* note 5, at 9 (explaining that in England, "where a rule of equity has become embodied in a statute, either unamended or in a revised form, it is usual to regard it as remaining part of the corpus of equity, despite its statutory guise and puissance").

**29.** 1 POMEROY, *supra* note 24, § 60, at 77–78.

**30.** 1 WOOLLEY's DELAWARE PRACTICE § 56, at 35 (1906). *See generally Glanding*, 45 A.2d at 560:

> The source of our equity jurisdiction and its development by our able Chancellors for-

Likewise, *Story's Equity Jurisprudence* explains that equity "has an expansive power, to meet new exigencies; and the sole question, applicable to the point of jurisdiction, must from time to time be[ ] whether such rights and wrongs do exist, and whether the remedies [therefore] in other courts, and especially in the courts of common law, are full, and adequate to redress." [31]

Having these principles and the rationale for the original grant of equitable standing to stockholders in mind, we examine the role of corporate directors and whether new exigencies require extending the doctrine of equitable standing to allow a director to bring a derivative action.

### Director Independence

 We begin with the bedrock statutory principle that "[t]he business and affairs of every corporation ... shall be managed by or under the direction of a board of directors...." [32] In discharging their management function, "directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." [33]

These duties stem in part from the quasi-trustee and agency relationship directors have to the corporation and stockholders that they serve. [34] Our exposition of the duty of loyalty is traceable to *Guth v. Loft, Inc.*, [35] where we held that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests": [36]

While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty[; he does this] affirmatively to protect the interests of the corporation committed to his charge.... [37]

Since *Guth*, we have repeatedly emphasized the important role of independent directors. [38] *Aronson v. Lewis* [39] explains

---

bids us from concurring in such a construction or interpretation of any statute conferring a new legal remedy unless it be clear from the language employed therein that the Legislature intended by said enactment to abrogate the preexisting equitable jurisdiction.

31. STORY, *supra* note 5, at 45.

32. 8 *Del. C.* § 141(a).

33. *Mills Acq'n Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989); *accord Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del.1986).

34. *E.g., Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1357 (Del.1985) ("The ultimate response to an actual takeover bid must be judged by the Directors' actions at that time, and nothing we say here relieves [the directors] of their basic fundamental duties to the corporation and its stockholders."). *See*

*generally* 4 POMEROY, *supra* note 8, § 1089, at 264–65 ("The rights, duties, liabilities, and remedies which result from the directors' agency are therefore *chiefly* legal; the *equitable* rights, duties, and remedies are mainly referable to the *trust* element of the directors' functions."); BALOTTI & FINKELSTEIN, *supra* note 12, § 4.16, at 4–113 ("Notwithstanding true ownership, most stockholders of today's large corporations are virtually powerless to affect control of corporate operations, so a stockholder must trust the directors to protect his or her investment by their direction of the corporation's management.").

35. 5 A.2d 503 (Del.1939).

36. *Id.* at 510.

37. *Id.*

38. *See, e.g., Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1375 (Del.1995) (explaining that "the presence of a majority of outside

why director independence inheres in the rationale for the business judgment rule: [40]

> The requirement of director independence [inheres] in the conception and rationale of the business judgment rule. The presumption of propriety that flows from an exercise of business judgment is based in part on this unyielding precept. Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences. While directors may confer, debate, and resolve their differences through compromise, or by reasonable reliance upon the expertise of their colleagues and other qualified persons, the end result, nonetheless, must be that each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act.[41]

We reiterated in *Beam v. Stewart*[42] that "[t]he primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences." [43] As *Aronson* and *Beam* demonstrate, director "independence" does not require that a director

---

independent directors will materially enhance such evidence" in support of meeting the reasonableness prong of the *Unocal* burden); *Macmillan, Inc.*, 559 A.2d at 1287 ("In the absence of self-interest, and upon meeting the enhanced duty mandated by *Unocal*, the actions of an independent board of directors in designing and conducting a corporate auction are protected by the business judgment rule."); *Unocal Corp. v. Mesa Petro. Co.*, 493 A.2d 946, 957 (Del.1985) ("If the board of directors is disinterested, has acted in good faith and with due care, its decision in the absence of an abuse of discretion will be upheld as a proper exercise of business judgment."); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del.1985) ("[W]hat we have here is more than the theoretical concept of what an independent board might do under like circumstances."); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 709 n. 7 (Del.1983) ("Although perfection is not possible, or expected, the result here could have been entirely different if UOP had appointed an independent negotiating committee of its outside directors to deal with Signal at arm's length."). *See also Beam v. Stewart*, 845 A.2d 1040, 1052 (Del.2004):

> To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.

To cite one example of how independent directors may cleanse conflict of interest transactions, Section 144(a) of the DGCL provides a safe harbor for interested transactions if they are approved by disinterested directors. 8 *Del. C.* § 144(a)(1); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del.2006) ("After approval by disinterested directors, courts review the interested transaction under the business judgment rule . . . .").

**39.** 473 A.2d 805 (Del.1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

**40.** *Id.* at 816.

**41.** *Id. See also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del.1993) ("We have generally defined a director as being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations. By contrast, a director who receives a substantial benefit from supporting a transaction cannot be objectively viewed as disinterested or independent.") (citations omitted).

**42.** 845 A.2d 1040 (Del.2004).

**43.** *Id.* at 1049.

remove the debate from the boardroom to the courtroom to resolve his or her differences with the board. Nor have we defined "independence" to enlarge a director's fundamental fiduciary duties so as to include a duty to sue on behalf of the corporation in his or her capacity as a director.[44]

Notwithstanding these considerations, Schoon advances a practical argument for his standing to sue. He contends that to protect the interests of the corporation and the stockholders, a director should be permitted to sue derivatively because the director is in a better position to know and to make his allegations against the board without waiting for a stockholder to do so. This proposed efficiency overlooks the reason why the equitable standing doctrine was adopted,[45] which (to reiterate) is to prevent a complete failure of justice on behalf of the corporation.[46]

No such complete failure is presented in this case. Here, the stockholder who elected Schoon (Steel) is not only aligned with him, but also is actively litigating other matters involving Troy before the Court of Chancery. We take judicial notice that Steel has already begun using the "tools at hand"[47] to obtain books and records information from Troy.[48] Giv-

44. "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone v. Ritter*, 911 A.2d 362, 370 (Del.2006) (citations omitted). Schoon's reliance on *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981) in support of his position, therefore, is misplaced.

45. *See* 4 POMEROY, *supra* note 8, § 1095, at 278. *See also Taormina v. Taormina Corp.*, 78 A.2d 473, 475 (Del.Ch.1951):

Generally a cause of action belonging to a corporation can be asserted only by the corporation. However, whenever a corporation possesses a cause of action which it either refuses to assert or, by reason of circumstances, is unable to assert, equity will permit a stockholder to sue in his own name for the benefit of the corporation solely for the purpose of preventing injustice when it is apparent that the corporation's rights would not be protected otherwise.

*See generally Sohland v. Baker*, 141 A. 277, 282 (Del.1927) ("The right of a stockholder to file a bill to litigate corporate rights is, therefore, solely for the purpose of preventing injustice, where it is apparent that material corporate rights would not otherwise be protected."); *Roberts v. Kennedy*, 116 A. 253, 254 (Del.Ch.1922) ("[O]wing to the fact that equity will look beyond the corporate entity and its legal rights and have regard for the stockholders as the beneficial and equitable owners

of its assets, such stockholders may, in case the corporation refuses, invoke the aid of equity in proper cases for their protection.").

46. Our recent decision in *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) is not inconsistent with this rationale. *Gheewalla* confers standing upon creditors to bring a derivative action where the corporation is insolvent, but only because the shareholders of an insolvent corporation no longer have an economic interest in the corporate entity—only its creditors have that interest. Only for that reason and in that context does *Gheewalla* permit creditors to stand in the shoes of the shareholders. Because *Gheewalla* merely substitutes creditors for shareholders in that limited setting, it does not represent an extension or enlargement of the scope of the equitable standing doctrine.

47. The books and records request under section 220 of the DGCL is one of the primary "tools at hand" to obtain the necessary information before filing a derivative action. *See, e.g., Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del.2006).

48. Steel has demanded inspection of Troy's books and records pursuant to section 220 "to value its shares and facilitate the sale of its stock to a third party," to which Troy agreed if Steel executed a confidentiality agreement. *Schoon v. Troy Corp.*, 2006 Del. Ch. LEXIS 123, 2006 WL 1851481, at *2 (Del.Ch. June

en the well-established duties of a director and the ability and the right of Steel, as a stockholder, to bring a derivative action if Steel deems it necessary, we perceive no new exigencies that require an extension of equitable standing to Schoon, as a director.[49]

### The ALI Proposal for Director Standing

In arguing that a grant of standing to directors will further the policy of protecting against misconduct by fiduciaries, Schoon urges us to adopt the 1994 proposal of the American Law Institute ("ALI") that relates to director standing.[50]

Section 7.02(c) of the ALI Principles provides: "A director of a corporation has standing to commence and maintain a derivative action unless the court finds that the director is unable to represent fairly and adequately the interests of the shareholders."[51] The commentary to this provision recognizes that this is a "special right" because "most directors will already have standing to sue as shareholders."[52] The ALI Principles also acknowledge that

normally a director will bring his or her concerns regarding illegal or fraudulent conduct to the board and that the preference is for the entire board to provide "a collegial response" to a director's concerns regarding potential misconduct.[53] The ALI Principles justify the creation of director derivative standing only for those occasions "when the board is dominated by a controlling shareholder, in which the board will fail to act even when clear evidence of misbehavior or illegality has been presented to it...."[54] The ALI Principles further reason that procedural requirements for maintaining a shareholder derivative suit, such as contemporaneous ownership and continuing ownership, do not apply to directors because "the director's fiduciary obligation entitles the director to seek to rectify wrongs to the corporation that do not directly injure the director."[55]

To date, there is little, if any, case law adopting, or legal commentary approving, this particular ALI proposal. Except for the Supreme Court of Pennsylvania's blanket adoption of §§ 7.02–7.10 and § 7.13,[56] no other state supreme court has expressly adopted the ALI Principles relating to

27, 2006). The Court of Chancery found Troy's confidentiality agreement unreasonable and resolved the conflict "in a way that balances the stockholder's right to find a buyer for its shares with the company's legitimate interest in protecting its competitive position and advantages." *Id.* at * 1.

49. Because we do not extend the doctrine of equitable standing, we need not address the defendants' argument that Schoon would not be an appropriate derivative shareholder plaintiff.

50. *See* Principles of Corporate Governance: Analysis and Recommendations 8–9 (1994).

51. *Id.* § 7.02(c) (internal cross-reference omitted). In adopting this section, the ALI found that the "right of a director to commence a derivative action ... has been recog-

nized ... in New York ... by statute." *Id.* § 7.02 cmt. h, at 42 (citing N.Y. Bus. Corp. Law §§ 719(a), 720).

52. *Id.* at 42–43.

53. *Id.* at 43. The ALI also recommended that "demand should be made upon the board before a suit is commenced." *Id.*

54. *Id.* Under the ALI standard, a derivative action brought by a director is still subject to the discretion of the board to either dismiss or settle the suit. *Id.* §§ 7.04, 7.07–7.13; 7.02 cmt. h.

55. *Id.* § 7.02 cmt. h, at 43.

56. *Cuker v. Mikalauskas*, 547 Pa. 600, 692 A.2d 1042, 1049 (1997).

standing. Apart from one pre-ALI Proposal reference of an intermediate appellate court to director standing,[57] Schoon cites no case permitting a director, who does not own stock, to sue derivatively. We recognize, as did the ALI, that New York provides by statute that a director can sue other directors on behalf of the corporation derivatively.[58] We regard the New York statute as confirming the prerogative of a legislature to confer standing upon a director by statute. To date, the Delaware General Assembly has not chosen to do so.

Given the absence of statutory authority for his standing to sue as a director, Schoon's argument must succeed or fail on the merits of extending the doctrine of equitable standing judicially. We have explained the rationale for this equitable doctrine and decline to enlarge it by embracing a policy that will divert the doctrine from its original purpose: to prevent a complete failure of justice. Schoon has not shown that a complete failure of justice will occur unless he is granted standing to sue as a director. A stockholder derivative action would fully and adequately redress any injuries to Troy resulting from a breach of fiduciary duty by its board. Accordingly, we decline to extend equitable standing to Schoon to sue derivatively in his capacity as a director.

### Conclusion

The judgment of the Court of the Chancery dismissing Schoon's complaint for lack of standing is **AFFIRMED.**

---

57. *Dotlich v. Dotlich,* 475 N.E.2d 331, 340 (Ind.Ct.App.1985) ("We see no reason why Sam should be barred from suing on behalf of the corporation just because he is a director.").

58. N.Y. Bus. Corp. Law §§ 719, 720 (McKinney 2007). *See also Tenney v. Rosenthal,* 6 N.Y.2d 204, 189 N.Y.S.2d 158, 160 N.E.2d 463, 467 (1959):

The situation is, obviously, quite different in the case of the director's derivative suit. His right to sue is based on the public policy declared by the Legislature upon enactment of the statute. We may assume that the right to bring suit has been granted in order to facilitate and improve the director's performance of the "stewardship obligation" which he owes to the corporation and its stockholders and to protect him from possible liability for failure to proceed against those responsible for improper management of the corporate affairs.

Note, *Director's Statutory Action in New York,* 36 N.Y.U. L.Rev. 199 (1961) (discussing how the director's suit differs from the stockholder derivative action).