**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 11, 2025

David A. Jenkins, Esquire
Smith, Katzenstein & Jenkins LLP
1000 North West Street, Suite 1501
Wilmington, DE 19801

Kevin M. Gallagher, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

> RE: *John Solak v. Michael A. Daniels et al.*,
>     Civil Action No. 2024-0857-MTZ

Dear Counsel,

I write in response to the parties' cross-motions for judgment on the pleadings. As you know, the plaintiff brought derivative and direct claims based on issuances of the defendant company's restricted stock units ("RSUs") that purportedly exceeded the limit set by the text of the operative compensation plan. The defendants contend that plan's text contained an error, and that the company and its stockholders had intended to raise the RSU limit when the stockholders approved the plan. The parties' cross-motions present several issues for the Court to consider on the pleadings.

The cross-motions also present one issue outside the pleadings I consider necessary to explore and address at the outset. The defendants assert the plaintiff approached the Court with unclean hands.[1] The company's August 2022 public filings showed the company was on pace to exceed the plan's stated RSU limit in 2023.[2] On August 9, 2023, the company announced it would be releasing its financial results for the fourth quarter and fiscal year.[3] That same day, the plaintiff

---

[1] Docket Item ("D.I.") 36 at 2–4 [hereinafter "Defs. Reply Br."]; *see also* D.I. 30 at 47–48 [hereinafter "Defs. Opening Br."].

[2] D.I. 1 ¶ 30 [hereinafter "Compl."]; *see also* Defs. Reply Br. at 2.

[3] Defs. Reply Br. Ex. M.

entered a trade to buy two shares of company common stock.[4]  On August 10, the company filed its 10-K, disclosing that it had indeed issued RSUs in excess of the stated plan limit.[5]  The plaintiff's trade settled the next day, August 11, and he became a company stockholder.[6]  In August 2024, like clockwork, the company disclosed it had issued even more RSUs, again in excess of the plan's stated RSU limit.[7]  The plaintiff sued eight days later.[8]  The defendants contend the plan's stated RSU limit was a drafting error, and should have been increased in a plan amendment the stockholders approved.[9] The company tried to fix the error with a compensation committee resolution, which the plaintiff insists was ineffective.[10]

Delaware law abhors a strike suit, meaning an action intended to provoke a settlement payment to the plaintiff and her counsel rather than to redress a meaningful governance problem.  Our courts seek to curtail the use of derivative actions "as a 'refuge of strike suit artists specializing in corporate extortion.'"[11]  One

---

[4] D.I. 34 [hereinafter "Pl. Reply Br."] Ex. K.

[5] Defs. Opening Br. Ex. G.

[6] Pl. Reply Br. Ex. K.

[7] Defs. Opening Br. Ex. H.

[8] *See generally* Compl.

[9] Defs. Opening Br. at 3–4, 12–13, 15–16; Defs. Reply Br. at 1, 22–23.

[10] *See* D.I. 20 Ex. A; Defs. Opening Br. at 15–16; Defs. Reply Br. at 24; Pl. Reply Br. 28–38.

[11] *Schoon v. Smith*, 953 A.2d 196, 203 (Del. 2008) (citing Carol B. Swanson, *Juggling Shareholder Rights and Strike Suits in Derivative Litigation: The ALI Drops the Ball*, 77 Minn. L. Rev. 1339, 1348 (1993)).  Delaware courts have developed both procedural and substantive guardrails to curtail representative litigation that offers no meaningful corporate or class benefit. *See generally* Matthew D. Cain et. al., *Mootness Fees*, 72 Vand. L. Rev. 1777, 1779–80 (2019).  Procedurally, Court of Chancery Rule 23.1's "demand requirement and concomitant heightened pleading standard" serve to "effectively distinguish between strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery and suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf." *White v. Panic*, 793 A.2d 356, 364 (Del. Ch. 2000) (internal quotation marks and citation omitted), *aff'd*, 783 A.2d 543 (Del. 2001).  Substantively, Delaware law evolved to "dramatically

way to do so is to "prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock."[12]  This court has enforced that policy through recent times.[13]

---

reduced the attractiveness of strike suits challenging M&A transactions in Delaware." *Anderson v. Magellan Health, Inc.*, 298 A.3d 734, 744 (Del. Ch. 2023).  In *Zapata*, the Supreme Court empowered independent directors to move to dismiss derivative claims they reasonably determined were not in the corporation's interest, enabling corporations "to rid themselves of meritless or harmful litigation and strike suits." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786–87 (Del. 1981).  Later, *MFW* and *Corwin* provided defendants with pleading-stage paths to business judgment deference, where the transaction was properly conditioned on robust procedural protections or approved by informed, uncoerced stockholder approval. *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).  And in *Trulia*, the Court rejected disclosure-only settlements absent "plainly material" disclosures and a "meaningful" release.  *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884 (Del. Ch. 2016).

[12] *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111 (Del. Ch. 1948).

[13] *See, e.g.*, *7547 P'rs v. Beck*, 682 A.2d 160, 165 (Del. 1996) (finding a settlement objector "who purchases a claim by buying stock after the alleged wrongdoing has occurred lacks standing"); *FMC Corp. v. R. P. Scherer Corp.*, 1982 WL 17888, at *2 (Del. Ch. Aug. 6, 1982) (observing the Court "has rejected the practice of 'buying' a lawsuit" and finding the plaintiff who bought company stock "16 days after" the challenged board decision lacked standing); *see also infra* note 15.

Delaware's policy against buying derivative standing is rooted in equity.[14]  It manifests in the Delaware General Corporation Law[15] and the doctrine of estoppel.[16]

---

[14] *Brown v. Automated Mktg. Sys., Inc.*, 1982 WL 8782, at *1–2 (Del. Ch. Mar. 22, 1982) (observing the contemporaneous ownership rule is "an extension of the general equitable principles [concerning] the standing of a shareholder to sue for corporate wrongs" (citing *Home Fire Ins. Co. v. Barber*, 93 N.W. 1024, 1029 (Neb. 1903))); *see also Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 710–11 (1974) (noting "the settled principle of equity" that plaintiffs who acquire shares after disputed transactions occur are barred from recovery).  That rule applies with more force for derivative actions because they are "a creature of equity."  *Schoon*, 953 A.2d at 202 (quoting 13 Fletcher Cyc. of the Law of Private Corp. § 5940, at 30 (2004)).

[15] *See* 8 *Del. C.* § 327 ("In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.").

Three years after the statute's enactment, then-Vice Chancellor Seitz traced its substance back to the federal contemporaneous ownership requirement designed to avoid fraudulent diversity jurisdiction and prevent the "evil" of purchasing derivative standing. *Burry Biscuit*, 60 A.2d at 111 & n.4; *accord Hawes v. City of Oakland*, 104 U.S. 450, 461 (1881) (requiring in derivative actions "an allegation that complainant was a shareholder at the time of the transactions of which he complains, or that his shares have devolved on him since by operation of law . . .").  The Vice Chancellor noted New York had adopted a similar statute, and that New York courts viewed that statute as designed to curb abusive and conflicted derivative litigation, and concluded this "was the sole purpose behind the enactment of" Delaware's statute.  *Burry Biscuit*, 60 A.2d at 111 (first citing *Klum v. Clinton Tr. Co.*, 48 N.Y.S.2d 267, 268 (N.Y. Sup. Ct. 1944) (observing New York enacted the contemporaneous ownership requirement because derivative actions were "very often grossly abused and utilized for reasons disconnected with the interest of the corporation"), *overruled on other grounds by Shielcrawt v. Moffett*, 61 N.E.2d 435 (N.Y. 1945); and then citing *Coane v. Am. Distilling Co.*, 49 N.Y.S.2d 838, 843 (N.Y. Sup. Ct. 1944) (describing the statute's goal as "to eradicate an evil then current with respect to [strike suits]" and the resulting curtail of "a fruitful source of unwarranted and unscrupulously conceived litigation"), *rev'd on other grounds*, 81 N.E.2d 87 (N.Y. 1948)).  This Court's near-contemporaneous explanation of Section 327's purpose has echoed through Delaware law since.  *E.g.*, *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984) ("The purpose of [the] rule [requiring continuous ownership] is well established:  to eliminate abuses associated with a derivative suit.");  *Ala. By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 264 n.12 (Del. 1995) ("The long-recognized policy behind Section 327 is to prevent strike suits whereby

A plaintiff who bought a claim with strike-suit motives also invokes the doctrine of unclean hands.[17] "He who comes into equity must come with clean hands."[18] A plaintiff who buys company stock to bring a derivative suit, then purports to speak on the company's behalf to extract benefits for herself or her counsel that exceed on a relative basis the suit's net benefit to the company, risks converting a derivative

---

an individual purchases stock in a corporation with purely litigious motives."); *Schreiber v. Bryan*, 396 A.2d 512, 516 (Del. Ch. 1978) ("The policy behind [Section 327] and [Rule 23.1] is to prevent so-called 'strike suits' whereby individuals purchase shares in a corporation with litigious motives."); *Jones v. Taylor*, 348 A.2d 188, 191 (Del. Ch. 1975) ("Turning to the policy behind § 327, it is well recognized that the section was enacted to eliminate strike suits and other abuses which developed along with the derivative suit."); *Maclary v. Pleasant Hills, Inc.*, 109 A.2d 830, 833 (Del. Ch. 1954) ("[Section 327] was not passed to prevent the correction of corporate wrongdoing. It was designed principally to prevent the purchasing of stock to be used for the purpose of filing a derivative action attacking transactions occurring prior to such purchase."); *Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121, 123 (Del. Ch. 1950) (noting Section 327's predecessor statute was meant to implement "the prevention of the evil of purchasing stock in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock"); *but see Bamford v. Penfold, L.P.*, 2020 WL 967942, at *24 n.18 (Del. Ch. Feb. 28, 2020) (referencing a "provocative article" that posits New York's contemporaneous ownership requirements may have "their roots in anti-Semitism" or classism, and concluding "it seems likely" Delaware's statute "was spurred by the New York initiative" (citing Lawrence E. Mitchell, *Gentleman's Agreement: The Antisemitic Origins of Restrictions on Stockholder Litigation*, 36 Queen's L.J. 71, 72 & n.1 (2010))).

[16] *Schreiber*, 396 A.2d at 517 ("A stockholder cannot complain of corporate action in which he has concurred."); *see also Brown*, 1982 WL 8782, at *2 ("[I]n such cases, the purchaser ought to take things as he found them when he voluntarily acquired an interest." (quoting *Home Fire*, 93 N.W. at 1029)). The estoppel doctrine has its recognized limits; it "cannot validate a void act." *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 991 (Del. Ch. 2024); *cf. id.* at 1000–01 (describing a pleading-stage inference that a stockholder who bought into a governance regime that had been previously disclosed as a defense-friendly inference, and positing "[t]he existence of Section 327 of the DGCL suggests that absent a statutory amendment, Delaware does not equate the act of purchasing shares with acquiescence to illegal conduct").

[17] *In re Riverbed Tech., Inc. S'holders Litig.*, 2015 WL 5458041, at *2 (Del. Ch. Sept. 17, 2015).

[18] *Bodley v. Jones*, 59 A.2d 463, 469 (Del. 1947) (cleaned up).

action from an equitable tool for corporate benefit into a conflicted and inequitable strike suit.[19]

The defendants assert unclean hands in their motion papers, accusing the plaintiff of buying shares to launch a strike suit.[20] The defendants also contend that the plaintiff is a frequent filer, raising further questions about his motive in filing suit.[21]

---

[19] *See Riverbed Tech.*, 2015 WL 5458041, at *2; *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1521371, at *2–4 (Del. Ch. Sept. 27, 2000).

[20] Defs. Reply Br. at 2–4; *see also* Defs. Opening Br. at 49–50.

[21] Defs. Opening Br. at 14; Defs. Reply Br. at 5. Based on a review of the Court's publicly available filing records, which are subject to judicial notice under D.R.E. 202(d)(1)(C), the plaintiff filed more than twenty lawsuits since 2012, including nineteen between 2016 and 2024. Seven of those lawsuits resulted in quick settlements with an average fee award of $338,000. *See Solak v. Amylin Pharms. Inc.*, C.A. No. 7684-CS (Del. Ch.); *Solak v. Sarowitz*, C.A. No. 12299-CB (Del. Ch.); *Solak v. Barrett*, C.A. No. 2017-0362-JRS (Del. Ch.); *Solak v. Meller*, C.A. No. 2019-0178-SG (Del. Ch.); *Solak v. Starr*, C.A. No. 2020-0674-KSJM (Del. Ch.); *Solak v. Sato*, C.A. No. 2020-0775-JTL (Del. Ch.); *Solak v. Huff*, C.A. No. 2022-0400-LWW. Applying the Court's customary 10–15% range for early settlements implies an average corporate benefit valued between $2.25 million to $3.38 million, which does not net out the cost of the lawsuit. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1259 (Del. 2012) (noting when "a case settles early, the Court of Chancery tends to award 10–15% of the monetary benefit conferred"). Eight of the plaintiff's actions were voluntarily dismissed without any substantive litigation activity—many before the defendants even responded to the complaint. *See Solak v. Performance Techs., Inc.*, C.A. No. 9239-VCL (Del. Ch.); *Solak v. Ferro, Jr.*, C.A. No. 12464-VCS (Del. Ch.); *Solak v. Calamos, Sr.*, C.A. No. 2017-0083-JTL (Del. Ch.); *Solak v. eXp World Hldg., Inc.*, C.A. No. 2020-1066-PAF (Del. Ch.); *Solak v. Skonnard*, C.A. No. 2021-0077-PAF (Del. Ch.); *Solak v. Redbox Ent., Inc.*, C.A. No. 2022-0099-LWW (Del. Ch.); *Solak v. Twitter, Inc.*, C.A. No. 2022-0491-KSJM (Del. Ch.); *Solak v. Novavax, Inc.*, C.A. No. 2024-0930-KSJM (Del. Ch.). The most recent action was filed in September 2024, and voluntarily dismissed six weeks later. *See Solak v. Novavax, Inc.*, C.A. No. 2024-0930-KSJM (Del. Ch.). The plaintiff appears to have pursued discovery in only one of his actions. *See Solak v. Glenn Sanford*, C.A. No. 2022-0483-PAF (Del. Ch.).

The doctrine of unclean hands "permits a court of equity to close its doors to applicants for equitable relief who have acted in violation of any fundamental concept of equity in connection with the matter in controversy."[22] The doctrine's foundational concern is to "protect the integrity of a court of equity."[23] Unclean hands "is not applied to favor a party litigant; rather, it is a rule of public policy" that the Court may implement sua sponte by refusing to assist an unclean litigant.[24] Whether the doctrine bars a litigant's claims is a gating inquiry.[25]

Given the significance of the allegation that the plaintiff bought two shares to pursue a strike suit, and the extent to which the record developed to date supports that theory, I find it appropriate to take up unclean hands before considering the merits of the plaintiff's suit. But that inquiry is informed by materials outside the pleadings: the plaintiff's affidavit and proof of his purchase of company stock, which both parties address.[26] Court of Chancery Rule 12 requires that when a party "moves under Rule 12(b)(6) or 12(c) and presents matters outside the pleadings that are not excluded by the Court," the motion "must be treated as one for summary

---

[22] Donald J. Wolfe, Jr. & Michael A. Pittenger, 2 *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.08[a], at 15-101 (2024).

[23] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976); *id.* ("[T]he purpose of the clean hands maxim is to protect the public and the court against misuse.").

[24] *New Start Hldgs., LLC v. Zhou*, 2024 WL 4039440, at *14 (Del. Ch. Sept. 4, 2024) ("This Court also has the inherent discretion to refuse to assist an unclean litigant."); *see also Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) (noting the "maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant"); *Bodley*, 59 A.2d at 492–93 ("The Court is so jealous in guarding itself against such misuse that it will sua sponte apply the maxim whenever it discovers the unconscionable conduct."); *Patel v. Dimple*, 2007 WL 2353155, at *12 (Del. Ch. Aug. 16, 2007) (applying the doctrine of unclean hands despite the defendant's failure to explicitly raise it).

[25] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 485 (Del. Ch. 2022) (resolving the "threshold question" of whether unclean hands can be invoked).

[26] Pl. Reply Br. Ex. K; *see also* Defs. Reply Br. at 2–4. This material does not fall into any of the buckets the court can consider outside the pleadings: it is not integral to the plaintiff's claim or incorporated into the complaint, it is relied on to prove the truth of its contents, and it is not susceptible to judicial notice. *See Acero Cap., L.P. v. Swrve Mobile, Inc.*, 2021 WL 2207197, at *1 (Del. Ch. June 1, 2021).

judgment."[27]   In order to consider those materials, I must convert the defendants' motion for judgment on the pleadings into one for summary judgment on the threshold question of whether the plaintiff acted with unclean hands.

If the Court opts to convert a motion for judgment on the pleadings to one for summary judgment, it must give the parties notice that affords a reasonable opportunity to pursue and present evidentiary material under Court of Chancery Rule 56, including any Rule 56(e) affidavit.[28]   Please accept this letter as notice of conversion for purposes of the Court's consideration of unclean hands, and proceed under Rule 56.  The conversion is on the narrow issue of unclean hands; the parties may take targeted discovery concerning the facts and circumstances of the plaintiff's purchase of the company's shares and filing of the suit.[29]   The pleading-stage motions are stayed pending resolution of the gating issue of unclean hands.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc:  All Counsel of Record, via *File & ServeXpress*

---

[27] Ct. Ch. R. 12(d); *Jimenez v. Palacios*, 250 A.3d 814, 841 (Del. Ch. 2019), *aff'd*, 237 A.3d 68 (Del. 2020).

[28] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1286 (Del. 2007); *Furman v. Del. Dep't of Transp.*, 30 A.3d 771, 774–75 (Del. 2011); Ct. Ch. R. 12(d)(2).

[29] *See Malpiede v. Townson*, 780 A.2d 1075, 1091 (Del. 2001) (cautioning against opening "the floodgates of discovery" when the Court treats a Rule 12 motion as one for summary judgment, and requiring the Court to "carefully limit the discovery sought to a scope that is coextensive with the issue necessary to resolve the motion"); *see id.* n.52 (collecting authorities that confirm discovery granted under a converted Rule 56 motion should be limited to the discrete factual issue); *see also Orman v. Cullman*, 794 A.2d 5, 40 (Del. Ch. 2002) (converting a Rule 12(b)(6) motion to a Rule 56 motion and permitting discovery relevant to "the very narrow [issue] concerning the existence or authenticity of the Company's exculpation provision").