# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SDF FUNDING LLC and STUART D. FELDMAN, derivatively on behalf of FLASHPOINT TECHNOLOGY, INC.,

Plaintiffs,

v.

STANLEY B. FRY, EDWARD D. HERRICK, ROSS BOTT, CYRUS W. GREGG, JARED FRY, RYAN C. FRY, and MAGDALENA RAMOS,

Defendants,

and

FLASHPOINT TECHNOLOGY, INC.,

Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2017-0732-KSJM

## MEMORANDUM OPINION

Date Submitted: February 1, 2022
Date Decided: May 13, 2022

John G. Harris, BERGER HARRIS LLP, Wilmington, Delaware; Douglas R. Hirsch, Ben Hutman, James Ancone, SADIS & GOLDBERG LLP, New York, New York; *Counsel for Plaintiffs SDF Funding LLC and Stuart D. Feldman*.

Douglas D. Herrmann, Emily L. Wheatley, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware; Pamela S. Palmer, Kevin Crisp, TROUTMAN PEPPER HAMILTON SANDERS LLP, Los Angeles, California; *Counsel for Defendants Stanley B. Fry, Edward D. Herrick, Ross Bott, Cyrus W. Gregg, Jared Fry, Ryan C. Fry, and Magdalena Ramos*.

**McCORMICK, C.**

Flashpoint Technology, Incorporated ("Flashpoint") is a Delaware corporation founded by Defendant Stanley Fry in 1996 to hold and license technology patents. Since Flashpoint's formation, Stanley[1] has served as CEO and Chairman of the Board of Directors. Stanley's sons, Defendants Jared Fry and Ryan Fry, work part-time for Flashpoint. Collectively, Stanley, Jared, and Ryan own 36% of the outstanding Flashpoint stock.

Plaintiff Stuart D. Feldman invested in Flashpoint in 1999 through a wholly owned entity. In March 2015, Feldman caused Flashpoint stock to be transferred to another Feldman-owned entity, Plaintiff SDF Funding, LLC ("SDF").

In May 2015, Feldman's investment manager requested Flashpoint's audited financials. From those documents, the manager discovered a series of loans by Flashpoint to entities controlled by the Fry family and other Flashpoint directors or employees. This discovery prompted SDF to demand inspection of Flashpoint books and records concerning any related-party transactions. From those documents, the plaintiffs learned that Flashpoint was paying to lease office and storage space at two properties owned by Stanley. Although the properties collectively served as the headquarters for at least twenty-six other entities owned by or affiliated with Stanley, Flashpoint shouldered the entire cost of the lease payment.

The plaintiffs filed the original complaint in October 2017 asserting four counts collectively challenging the loan transactions and lease payments. Through discovery, the

---

[1] For clarity, this decision refers to the members of the Fry family by their first names. The court intends no disrespect.

plaintiffs learned that Flashpoint had paid the Fry family members over $20 million in cash bonuses between 2010 and 2013. They also came to believe that the defendants had diverted corporate opportunities to entities that they owned and that those opportunities have earned nearly $20 million in revenue.

The plaintiffs amended the complaint in December 2020 to add Jared and Ryan as defendants and to add an additional four counts, collectively challenging the compensation decisions and alleging usurpation of corporate opportunities.

The defendants moved for summary judgment on the four original counts and to dismiss the other counts. This decision resolves those motions. Jared and Ryan moved to dismiss for lack of personal jurisdiction and on other grounds unique to them. Jared and Ryan's motions are addressed in a separate decision.

The defendants advance one argument in support of their motion for summary judgment. They observe that the plaintiffs' claims are derivative and thus subject to the contemporaneous ownership requirement, but Feldman never owned stock in Flashpoint and SDF did not acquire stock until March 2015. The defendants argue that the plaintiffs lack standing to pursue the claims challenging conduct before SDF became a stockholder. This decision grants the defendants' motion for summary judgment as to claims challenging actions taken prior to March 2015. In reaching this conclusion, the court rejects the plaintiffs' argument that Feldman has equitable standing to pursue those claims.

The defendants moved to dismiss the amended complaint for failure to plead demand futility and failure to state a claim. Given the composition of Flashpoint's board and the nature of the claims at issue, the defendants' dismissal arguments fail.

2

## I. FACTUAL BACKGROUND

For the motion to dismiss, the facts are drawn from the Amended Verified Shareholder Derivative Complaint (the "Amended Complaint")[2] and documents incorporated by reference, including public filings and documents obtained in response to a demand made pursuant to Section 220 of the Delaware General Corporation Law by Stanley and SDF ("Plaintiffs"). Except as to direct quotations, facts drawn from the Amended Complaint are set forth in the background without citation.

For the motion for summary judgment, the facts are drawn from the declarations and exhibits submitted by the parties. To draw the distinction between the well-pled allegations of the Amended Complaint and those germane to the motion for summary judgment, this decision includes citations where facts are drawn from the summary judgment record.

### A. Flashpoint

Flashpoint is a Delaware corporation headquartered in Peterborough, New Hampshire. Flashpoint was founded by Defendant Stanley in 1996 to "develop[] advanced technology solutions and intellectual property relating to the convergence of internet communications and digital content."[3] Essentially, Flashpoint holds and licenses technology patents.

---

[2] C.A. No. 2017-0732-KSJM, Docket ("Dkt.") 84 ("Am. Compl.").

[3] *Id.* ¶¶ 26–27.

Since Flashpoint's formation, Stanley has served as CEO and Chairman. Stanley's sons, Defendants Jared and Ryan, work part-time for Flashpoint. Collectively, Stanley, Jared, and Ryan own 36% of the outstanding Flashpoint stock.

At times relevant to this litigation, the Flashpoint board comprised Stanley and Defendants Edward Herrick, Ross Bott, and Cyrus Gregg. Herrick resigned from the Board before this litigation commenced. When the original complaint and Amended Complaint were filed, the Flashpoint board comprised Stanley, Bott, and Gregg.

## B. The Challenged Transactions

The Amended Complaint challenges the following related-party transactions dating back to 2011.

### 1. The Collision Transactions

Stanley formed Collision Technology, LLC under Delaware law to purchase internet and telecommunications patents (the "Collision Opportunity"). In 2012, Collision Technology, LLC converted to a Delaware corporation, Collision Communications, Inc. ("Collision").

After the conversion, Herrick, Bott, and Jared comprised Collision's board. Stanley owns 46% of Collision. Herrick invested $3 million in Collision through Collision Funding Partners, LLC. Ryan is an employee of Collision.

Between mid-2011 and the end of 2014, Flashpoint loaned Collision over $4.41 million (collectively, the "Collision Loans"). Put into perspective, this amounted to more than the total value of Flashpoint's end-of-year non-tax assets for 2012, 2013, and 2014.

4

The Flashpoint board approved the first loan to Collision in April 2011 for $3.2 million in exchange for a Derivative Rights Agreement ("DRA"). Flashpoint made additional loans to Collision for over $1 million between November 17, 2011, and December 31, 2012. Flashpoint later loaned Collision $200,000 during 2014, bringing the total amount of outstanding loans to over $4.4 million.

In May 2015, the Flashpoint board voted to forgive approximately $4,213,992 of debt under the Collision Loans and extinguish the DRA in exchange for Collision stock. In exchange, Flashpoint received 36.9% of Collision preferred stock.

### 2. The Concert Transactions

Stanley formed Concert Technology, Inc. ("Concert") in 2005 under Delaware law to develop and license technologies and intellectual property relating to the organization and distribution of digital content.

Stanley is Chairman of Concert's board. Flashpoint has identified Concert as an affiliate of Stanley in various records since October 2005. Herrick, Bott, and Gregg have served on the Concert board since 2008, Defendant Magdalena Ramos—a Flashpoint employee—has been the Corporate Secretary since 2009, and Ryan was a Concert employee before joining the Concert board in 2012.

In March 2011, the Flashpoint board approved an unsecured loan for $500,000 to Concert. Between 2012 and 2014, the Board advanced over $90,000 to Concert (collectively, the "Concert Loans") for "employee, administrative and office support

resources."[4]  In 2012, Flashpoint established a reserve for the $500,000 loan plus $12,187 in interest because the loan was deemed "uncollectible."[5]

Around the same time that Flashpoint designated the $500,000 loan uncollectible, Flashpoint approved an interest-free advance of "employee, administrative and office support resources to Concert."[6]  The advance amounted to $56,192 by the end of 2013 and eventually grew to over $90,000 by the end of 2014.  The advance was made despite Concert's earlier default and the fact that "Concert had no net revenues since its inception in 2005."[7]

### 3. The Lease Payments

Beginning in November 2004, Flashpoint made payments to lease office and storage space at Stanley's personal home at 69 Pine Street (the "Lease Payments"), although that address is not listed as a corporate location on Flashpoint's website.

The monthly lease called for payments of $4,355 for a home valued at approximately $374,000.  Flashpoint pays twice as much to lease this office than it pays to lease its headquarters.  At least 18 other business entities affiliated with Stanley purport to operate out of the 69 Pine Street location.  In total, Flashpoint paid $775,000 in rent for the 69 Pine Street location.

---

[4] *Id.* ¶ 86.

[5] *Id.* ¶ 78.

[6] *Id.* ¶ 86.

[7] *Id.* ¶ 89.

Stanley also used the Flashpoint headquarters at 20 Depot Street for at least eight other entities under his control, including Collision and Concert. Flashpoint shouldered the entire cost of the lease payment. If the rental cost for the headquarters was shared pro rata by the eight other entities, then Flashpoint's monthly rental costs would fall from $2,366 per month to $262.89 per month.

### 4. The Compensation Decisions

Between 2008 and 2010, the Flashpoint directors awarded stock bonuses to themselves along with Jared and Ryan (collectively, the "Stock Bonuses"). The recipients received over $6 million in dividend payments in 2011 as a consequence of the Stock Bonuses.

Between 2010 and 2013, the Flashpoint board awarded over $20 million in cash bonuses for Stanley, Jared, and Ryan (together with the Stock Bonuses, the "Compensation Decisions").

Stanley received over $16 million in bonuses, which equaled nearly 10% of Flashpoint's total revenues for the period. Stanley's sons—Jared and Ryan—received $2,145,196 and $1,562,699 in bonuses respectively, each for part-time employment.

### 5. The Usurped Corporate Opportunities

In 2009, Stanley formed Retro Reflective Optics, LLC ("Retro") to hold intellectual property and patents. Stanley, Jared, Ryan, Gregg, and Ramos own Retro indirectly through affiliated entities. Retro purchased patents from BAE Systems Information and Electronic Systems Integration Inc. for $3 million (the "Retro Opportunity"). Stanley secured funding for the acquisition from Credit Suisse Management, LLC.

7

In 2011, Stanley, Herrick, Jared, Ryan, and Ramos formed Optical Devices, LLC ("Optical") to purchase patents from Sony Corporation (the "Optical Opportunity" and together with the Retro Opportunity, the "Corporate Opportunities").  Optical acquired the patents from Sony for $4.95 million.

Retro and Optical have earned nearly $20 million in revenue since January 1, 2013. Both Retro and Optical operate out of properties leased and paid for by Flashpoint.  Neither the Retro Opportunity nor the Optical Opportunity were presented to Flashpoint.

### C.    Plaintiffs' Stock Ownership

In 1999, Feldman acquired 246,912 shares of Flashpoint stock for $1 million through his wholly-owned subsidiary, Chelsey Capital, LLC ("Chelsey").[8]  In March 2015, Feldman caused Chelsey to transfer the Flashpoint stock to another Feldman-owned entity, SDF.[9]  Feldman signed the transfer documents on behalf of both Chelsey and SDF.[10]  SDF did not pay any consideration to Chelsey and no valuation was conducted as part of the transfer because SDF and Chelsey were both 100% owned by Feldman.[11]

---

[8] Dkt. 120, Ex. AA ("Feldman Dep. Tr.") at 9:21–10:11, 15:18–16:3, 43:22–43:24; Dkt. 124, Stanley Fry Decl. ¶ 3.

[9] Dkt. 142, Ex. 6.

[10] *Id.*

[11] Feldman Dep. Tr. at 65:9–65:21; Dkt. 142, Ex. 6.

8

## D.    Discoveries Leading To This Litigation

From 2004 to 2008, Flashpoint sent audited financial statements to stockholders annually.[12]   After 2008, Flashpoint distributed financials to stockholders upon request only.[13]

Non-party Don Kelley has managed Feldman's investment in Flashpoint since 2003.[14]   In May 2015, after Chelsey transferred its Flashpoint stock to SDF, Kelley requested and received Flashpoint's 2012–2013 financials.[15]   From these documents, Plaintiffs learned of the Collision Loans and the Concert Loan.

That same month, Plaintiffs sent Flashpoint a demand to inspect books and records pursuant to 8 *Del. C.* § 220 seeking documents regarding related-party transactions between 2011 and 2013.[16]   Plaintiffs sent three additional Section 220 demands between December 2015 and April 2016.[17]   From the documents received through the Section 220 investigation, Plaintiffs learned of the Lease Payments.[18]

Plaintiffs filed this action on October 13, 2017.   The original complaint named Stanley, Herrick, Bott, Gregg, and Ramos as defendants and Flashpoint as the nominal

---

[12] *See* Dkt. 100, Ex. G; Dkt. 101, Ex. I; Dkt. 102, Ex. J; Dkt. 107, Ex. N.

[13] *See, e.g.*, Dkt. 111, Ex. R.

[14] Dkt. 73, Don Kelley Decl. ¶¶ 1, 3.

[15] Dkt. 142, Ex. 14.

[16] Dkt. 117, Ex. X.

[17] Dkt. 118, Ex. Y.

[18] Dkt. 143, Ex. 56.

defendant.  The original complaint asserted four counts collectively challenging the Collision Loans, the Concert Loan, and the Lease Payments.

Plaintiffs amended their complaint after receiving discovery.  The amendments added Jared and Ryan as defendants and asserted four additional counts for breach of fiduciary duty in connection with the Compensation Decisions and for usurpation of the Corporate Opportunities.

Plaintiffs assert the following claims in the Amended Complaint:

- In Count I, Plaintiffs claim that all Defendants breached their fiduciary duties by making and then forgiving the Collision Loans.

- In Count II, Plaintiffs claim that Stanley, Herrick, Gregg, Bott, and Ramos breached their fiduciary duties by approving the Concert Loan.

- In Count III, Plaintiffs claim that Stanley breached his fiduciary duties by causing Flashpoint to make the Lease Payments.

- In Count IV, Plaintiffs claim that Herrick, Gregg, Bott, and Ramos aided and abetted Stanley's breach of fiduciary duties.

- In Count V, Plaintiffs claim that all Defendants except Ramos breached their fiduciary duties by granting cash and stock bonuses to Stanley, Jared, and Ryan.

- In Count VI, Plaintiffs claim that all Defendants except Bott breached their fiduciary duties by forming Collision, Retro, and Optical to improperly usurp corporate opportunities belonging to Flashpoint.

- In Count VII, Plaintiffs claim that Jared and Ryan aided and abetted Stanley's breach of fiduciary duties by (i) creating Collision to usurp the Collision Opportunity, (ii) awarding cash and stock bonuses, and (iii) creating Retro and Optical to usurp the Retro and Optical Opportunities.

- In Count VIII, Plaintiffs claim that all Defendants except Ramos were unjustly enriched by the actions challenged in Counts I through VII in the total amount of $26,320,958.

10

On December 14, 2020, Defendants moved for summary judgment on Counts I through IV. Defendants also moved to dismiss Counts I, II, and V through VIII. The motions were fully briefed on June 18, 2021, and the court held oral argument on June 30, 2021. On October 4, 2021, the court requested supplemental briefing on issues presented by the motions.[19]

## II. LEGAL ANALYSIS

Defendants move for summary judgment on Counts I through IV on the grounds of standing. Defendants argue that SDF lacks standing as to Counts I through IV, which challenge conduct that occurred before SDF acquired stock in Flashpoint.[20] Defendants further argue that Feldman lacks standing because he never held Flashpoint stock directly.

Defendants move to dismiss Counts V and VIII under Court of Chancery Rule 23.1 for failure to adequately allege demand futility and under Rule 12(b)(6) for failure to state a claim. Defendants also move to dismiss Count VI under Rule 12(b)(6).

This decision addresses Defendants' arguments concerning standing, demand futility, and failure to state a claim, in that order.

---

[19] Jared and Ryan joined in Defendants' motions and asserted additional arguments, including that this court lacks personal jurisdiction over them. By a separate decision, the court granted Jared and Ryan's motion to dismiss for lack of personal jurisdiction. Reference to "Defendants" in the legal analysis excludes Jared and Ryan.

[20] Defendants argue that the doctrine of laches and the analogous statute of limitations should bar Plaintiffs from pursuing their claims in Counts I through IV concerning transactions that occurred three years before Plaintiffs filed this litigation in October 2017. Dkt. 92, Defs.' MSJ Opening Br. at 40. Under this argument, claims challenging actions that occurred before October 2014 would be time-barred. Because SDF lacks standing to challenge actions in Counts I through IV that occurred before March 2015, and Feldman lacks standing entirely, the court need not consider Defendants' laches argument.

11

## A. Standing

The parties agree that Plaintiffs' claims are derivative. Under Section 327 of the DGCL, referred to as the "contemporaneous ownership requirement," a stockholder must hold stock at the time of the alleged wrong to have standing to pursue a derivative claim.[21] Invoking the contemporaneous ownership requirement, Defendants argue that Feldman lacks standing because he never held Flashpoint stock directly, and that SDF lacks standing to assert Counts I through IV to the extent those claims challenge events that occurred before SDF became a stockholder.

The contemporaneous ownership requirement of Section 327 is not universally beloved.[22] As Vice Chancellor Laster has persuasively argued, the contemporaneous ownership requirement lacks justification, seems historically rooted in anti-Semitism, and calls out for reexamination.[23] But Section 327 is the law, which this court is bound to apply.

---

[21] 8 *Del. C.* § 327 (providing that "[i]n any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law"); Ct. Ch. R. 23.1 (mirroring Section 327).

[22] When preparing this decision, I concluded that supplemental briefing on the issue of equitable standing would be helpful. In my letter to the parties requesting supplemental briefing, I previewed much of the analysis contained in this portion of the decision. *See* Dkt. 165, Letter to Counsel (also available at *SDF Funding LLC v. Fry*, 2021 WL 4519599 (Del. Ch. Oct. 4, 2021)). I repeat portions of that letter here to backfill the analysis.

[23] *See generally* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673, 677–78 (2008) (making the argument that the contemporaneous ownership requirement is a rule without any coherent purpose or justification); *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *9–10 & n.5 (Del. Ch.

Plaintiffs do not dispute that the contemporaneous ownership requirement deprives SDF of standing to challenge transactions that occurred before SDF obtained Flashpoint stock. SDF acquired Flashpoint stock on March 10, 2015. Accordingly, SDF's claims challenging transactions that occurred before that date are barred by the contemporaneous ownership requirement.

Portions of Counts I, III, and IV challenge conduct that occurred on or after March 10, 2015, and Defendants' motion for summary judgment against SDF as to those events is denied.[24]

In an attempt to salvage the rest of Counts I through IV, Plaintiffs argue that the court should find that Feldman has equitable standing. The essence of Plaintiffs' argument

---

Aug. 19, 2019) (Laster, V.C.) (collecting authorities criticizing the logic of the contemporaneous ownership requirement); *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *24 n.18 (Del. Ch. Feb. 28, 2020) (Laster, V.C.) (collecting more authorities criticizing the logic of the contemporaneous ownership requirement, including Lawrence E. Mitchell, *Gentleman's Agreement: The Antisemitic Origins of Restrictions on Stockholder Litigation*, 36 Queen's L.J. 71, 72 & n.1 (2010), suggesting that the requirement was born from anti-Semitic sentiments).

[24] To be clear, Defendants' motion for summary judgment on SDF's lack of standing nominally targets the entirety of Counts I through IV of the Amended Complaint, but some of the conduct challenged in those Counts is alleged to have occurred after March 10, 2015. Specifically, the following events at issue in Counts I through IV occurred *before* March 10, 2015: Count I, related to the Collision Opportunity (sometime between 2010 and 2011); Count II, $500,000 unsecured Concert Loan (March 2011) and $90,000 advance (between 2012 and 2014); Count III, Lease Payments made before March 10, 2015; and Count IV, aiding and abetting Lease Payments made before March 10, 2015. The aspects of Counts I through IV that occurred or continued *after* March 10, 2015, are as follows: Count I, forgiveness of the $4.21 million Collision Loans (May 2015); Count III, Lease Payments made on or after March 10, 2015; and Count IV, aiding and abetting Lease Payments that occurred on or after March 10, 2015.

13

is that the court should look through the LLCs of Chelsey and SDF and grant derivative standing to their sole owner, Feldman.

As the court previously observed,[25] Plaintiffs' argument would have the court extend the equitable standing doctrine beyond its current reach. In *Schoon v. Smith*, the Delaware Supreme Court held that the equitable standing doctrine may be extended to address "new exigencies."[26] The *Schoon* decision also articulated the standard this court applies when determining whether to extend the doctrine. Lifting language from a historical treatise of equity and a 1950s decision of this court, *Schoon* held that a court will extend the doctrine of equitable standing "*to set in motion the judicial machinery of the court . . . solely to prevent an otherwise complete failure of justice*."[27] Later in the decision, *Schoon* appended a prepositional phrase to the last clause in this quote, stating that "the equitable standing doctrine was adopted . . . to prevent a complete failure of justice *on behalf of the corporation*."[28]

The "complete failure of justice" phrase of *Schoon* has since been elevated to an eponymous standard, which has been cited, adopted, or quoted with approval in several Delaware Supreme Court and Court of Chancery cases.[29] Though oft cited, the phrase is

---

[25] Dkt. 165, Letter to Counsel at 8; *SDF Funding*, 2021 WL 4519599, at *8.

[26] 953 A.2d 196, 209 (Del. 2008).

[27] *Id.* at 202 & n.13 (emphasis in original) (citing 4 Pomeroy's Equity Jurisprudence § 1095 at 278 (5th ed. 1941) and *Taormina v. Taormina Corp.*, 78 A.2d 473, 475 (Del. Ch. 1951)).

[28] *Id.* at 208 (emphasis added).

[29] *See*, *e.g.*, *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021) (quoting "complete failure of justice" as established standard); *Morris v. Spectra Energy*

far from self-explanatory. For this reason, in this case, the court requested supplemental briefing on the standard. In response, the parties helpfully directed the court to case law elucidating the doctrine and inventoried cases extending and declining to extend its scope.[30]

As the supplemental briefs explained, derivative standing is among the bedrock equitable doctrines, and the "complete failure of justice" standard directing the doctrine's expansion calls out for an extensive discussion. Fortunately, esteemed Delaware jurists have already answered the call,[31] unburdening this jurist with the need to do so, and allowing this analysis to get straight to the point.

The "complete failure of justice" standard focuses on the ability to access "judicial machinery" to remedy alleged harm to a corporation or its residual claimants.[32] Delaware courts have extended the doctrine of equitable standing where alternative avenues of remedying harm to the corporation and its residual claimants are foreclosed.[33] Delaware

---

*P'rs (DE) GP, LP*, 246 A.3d 121, 130 (Del. 2019) (same); *El Paso Pipeline GP Co. LLC v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016) (same); *Drachman v. Cukier*, 2021 WL 5045265, at *6 (Del. Ch. Oct. 29, 2021); *Hindlin v. Gottwald*, 2020 WL 4206570, at *6 (Del. Ch. July 22, 2020) (same); *Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chi. v. Smith*, 2016 WL 3223395, at *10 (Del. Ch. May 31, 2016) (same).

[30] *See* Dkt. 172, ("Pls.' Supp. Br."); Dkt. 173, Defs.' Supp. Br.; Dkt. 179, Defs.' Answering Supp. Br.; Dkt. 180, Pls.' Answering Supp. Br.

[31] With gratitude, I cite Justice Ridgely's decision in *Schoon*, 953 A.2d at 200–06, and Vice Chancellor Laster's decision in *In re Carlisle Etcetera LLC*, 114 A.3d 592, 601–07 (Del. Ch. 2015).

[32] *Schoon*, 953 A.2d at 202 (citations omitted).

[33] *See, e.g.*, *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 107, 111 (Del. Ch. 1948) (extending equitable standing to beneficial owners of stock); *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101–02 (Del. 2007) (extending equitable standing to creditors of insolvent corporations); *In re Carlisle*, 114 A.3d at 607

15

courts have declined to extend the doctrine of equitable standing where other avenues for invoking judicial machinery exist in theory because other potential plaintiffs would have standing to pursue the claims at issue.[34]

The history of this court's application of the equitable standing doctrine is no doubt inconsistent; one could surely identify decisions that appear to invoke the concept of "equitable standing" as a catch-all to encompass situations where other doctrines would suffice or where the proffered injustice was to the individual plaintiff and not the nominal defendant.[35] Historically, however, equitable standing has been deployed as a solution to the dilemma of corporate harm caused by fiduciaries. The injustice relevant to the "complete failure of justice" analysis looks to the rights of the corporation or residual claimants as a whole and not any individual plaintiff. In that sense, the standard is best

---

(extending equitable standing to a party who held an economic interest in the LLC, but who had no statutory standing to sue, where member deadlock resulted in a status quo that foreclosed other mechanisms of accountability and prevented the LLC from operating in accordance with the governance structure set forth it is constitutive agreement); *see also Bamford v. Penfold L.P.*, 2020 WL 967942, at *28–30 (Del. Ch. Feb. 28, 2020) (recognizing double-derivative standing where all other paths for vindicating the alleged claims of a corporate subsidiary were blocked by the defendant's calculated restructuring maneuver).

[34] *See, e.g.*, *Schoon*, 953 A.2d at 210 (declining to extend equitable standing to directors when stockholders could bring derivative action); *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *17 (Del. Ch. Jan. 31, 2013) (declining to extend equitable standing to plaintiff where non-party had the ability to bring derivative action and plaintiff failed to establish why that non-party could not or would not bring that action).

[35] The preceding two footnotes do not purport to catalogue the entirety of Delaware cases applying, or purporting to apply, the equitable standing doctrine.

16

articulated in combination with the prepositional phrase added in *Schoon*: "on behalf of the corporation."[36]

*Schoon* is illustrative. There, a director filed a derivative action alleging breaches of fiduciary duty by his fellow directors, arguing that the trial court should extend the doctrine of equitable standing to allow a director to bring a derivative action. The trial court rejected this argument, granting the defendants' motion to dismiss the complaint.

On appeal, the Supreme Court conducted a historical analysis of the doctrine of equitable standing extending back to England's Plantagenet period. As the court observed, the doctrine gained greater significance during the industrial revolution, when the "individual stockholder was in need of a means of invoking judicial power to curb managerial abuse."[37] Because equitable standing is a judicially-created doctrine, the court reasoned that it could be "judicially extended to address new circumstances."[38] The court further reasoned that a doctrine born of necessity should be extended more broadly only to address the animating need—"preventing injustice where it is apparent that material corporate rights would not otherwise be protected."[39]

In *Schoon*, the court held that "no such complete failure is presented in this case" because the stockholder who elected Schoon (Steel) had standing to pursue the claims

---

[36] 953 A.2d at 208.

[37] *Id.* at 201 (citing Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on its Derivation*, 32 N.Y.U. L. Rev. 980, 986 (1957)).

[38] *Id.* at 204.

[39] *Id.* at 202.

asserted by Schoon.[40]  The court stated: "Given the . . . ability and the right of Steel, as a stockholder, to bring a derivative action if Steel deems it necessary, we perceive no new exigencies that require an extension of equitable standing to Schoon, as a director."[41]  In reaching this conclusion, the court rejected practical arguments made by Schoon in support of a director's standing to sue.  Namely, Schoon argued that "the director is in a better position to know and to make his allegations against the board without waiting for a stockholder to do so."[42]  In response to this argument, the court eschewed the notion that equitable standing will be invoked for convenience as opposed to necessity.  The court stated that "[t]his proposed efficiency overlooks the reason why the equitable standing doctrine was adopted, which (to reiterate) is to prevent a complete failure of justice on behalf of the corporation."[43]  This last point informs the meaning of "complete failure of justice on behalf of the corporation"—where other avenues for relief exist for the corporation, even if only theoretical, extending the doctrine of equitable standing is unnecessary.

This case, like *Schoon*, lacks any new exigency warranting an extension of the equitable standing doctrine.  In *Schoon*, there were no structural impediments to the pursuit of derivative claims because stockholders had standing to enforce a corporate right.  In this case, there are not structural impediments to the pursuit of derivative claims because

---

[40] *Id.* at 208–09.

[41] *Id.*

[42] *Id.* at 208.

[43] *Id.*

stockholders other than Plaintiffs have standing to enforce a corporate right.[44] At base, any ostensible injustice in declining Feldman standing would be to Feldman only. Accordingly, the court will not "look through" SDF to grant Feldman standing.

Considerations unique to SDF's status as a limited liability company increase the court's reluctance to extend the doctrine of equitable standing in this case. In 1988, the Internal Revenue Service ruled that an LLC could qualify as a partnership for federal income tax purposes, allowing pass-through tax treatment and avoiding the burden of double taxation.[45] This "stimulated enormous interest in the limited liability company form of business organization and served as a catalyst for new limited liability company legislation."[46] Delaware developed an enabling statute, which became effective on October 1, 1992.[47] Since then, Delaware LLCs have become an increasingly popular entity for doing business, both public and private.[48]

---

[44] Plaintiffs seek to skirt this fact by arguing that "no other stockholder *is known* to be qualified and willing to bring this action." Pls.' Supp. Br. at 6 (emphasis added). The standard, however, is not subjective. Were the standard subjective, a plaintiff could easily circumvent the rule by manufacturing "new exigencies" with something as simple as a Sergeant Schultz affidavit: "I see nothing! I hear nothing! I know nothing!"

[45] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies*, § 1.01 (2d ed. 2019) ("Symonds").

[46] *Id.*

[47] *Id.*

[48] According to data from the Delaware Secretary of State, 290,574 Delaware LLCs were created over a three-year period between 2006 and 2008, for an average of 96,858 LLCs per year, and that number increased to 503,428 LLCs between 2018 and 2020 for an annual average of 167,809 LLCs. *Compare* Delaware Division of Corporations, *2008 Annual Report* (June 26, 2009), available at https://corpfiles.delaware.gov/2008AR.pdf, *with* Delaware Division of Corporations, *2020 Annual Report Statistics* (2021), available at

There are a number of core features common to Delaware LLCs, starting with freedom of contract. "Rather than imposing a host of immutable rules, the statute generally allows parties to order their affairs, contractually, as they deem appropriate."[49] The LLC's operating agreement governs its internal relationships and business operations. Delaware LLCs operate as a corporate shield against the liability of its members for the activities of the LLC.[50] And LLCs may pass-through tax liability to their members.[51]

As Feldman admitted in his deposition, Feldman embraced the benefits of the LLC as a business model.[52] Thus, even if the court were to consider injustice to Feldman in declining Feldman standing, it is far from unjust to refuse Feldman's request to cast aside the veils of Chelsey and SDF and allow him to serve as their equitable stand-in.

---

https://corpfiles.delaware.gov/Annual-Reports/Division-of-Corporations-2020-Annual-Report.pdf.

[49] Symonds § 1.03; *In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. Sept. 23, 2008) ("An LLC is primarily a creature of contract[.]").

[50] 6 *Del. C.* § 18-303(a) (stating that "the debts, obligations and liabilities of a limited liability company . . . shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager . . . shall be obligated personally").

[51] 6 *Del. C.* § 18-1107(a) ("For purposes of any tax imposed by the State of Delaware . . . a domestic limited liability company . . . shall be classified as a partnership unless classified otherwise for federal income tax purposes . . . in which case the . . . limited liability company shall be classified in the same manner as it is classified for federal income tax purposes."); *see also* 2 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 20.1 (4th ed. 2021) (stating that an LLC is "like a partnership for federal income tax purposes and is like a corporation with respect to the liability of its owners").

[52] Feldman testified that he owns and runs a "family office" comprised of some unspecified number of LLCs, which employ more than 300 people. Feldman Dep. Tr. at 17:9–15. He claimed not to know what assets are owned by any given LLC at any time. *See id.* at 20:15–22. He declined to reveal the value of assets held by Chelsey or SDF. *Id.* at 19:10–20:17.

Defendants' motion for summary judgment on all Counts as to Feldman and Counts I through IV as to SDF for claims that occurred prior to March 10, 2015, is granted.

## B. Demand Futility

Defendants moved to dismiss Counts V and VIII (the "Compensation Counts") under Court of Chancery Rule 23.1 for failure to plead demand futility.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[53] "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[54] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they

---

[53] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253–54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

[54] *United Food & Com. Workers Union v. Zuckerberg*, 2020 WL 6266162, at *7 (Del. Ch. Oct. 26, 2020).

wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[55] The demand requirement is a substantive principle under Delaware law.[56] Rule 23.1 is the "procedural embodiment of this substantive principle."[57]

Under Rule 23.1, stockholder plaintiffs must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[58] Stockholders choosing to allege demand futility must meet "heightened pleading requirements,"[59] alleging "particularized factual statements that are essential to the claim."[60] "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered."[61]

Recently, the Delaware Supreme Court affirmed *Zuckerberg* and thereby adopted Vice Chancellor Laster's "universal test" for demand futility that blends elements of the

---

[55] *Id.*

[56] *Id.*; *see* Ct. Ch. R. 23.1(a).

[57] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[58] Ct. Ch. R. 23.1(a).

[59] *Zuckerberg*, 2020 WL 6266162, at *8.

[60] *Brehm*, 746 A.2d at 254.

[61] *Id.* at 255.

22

two precursor tests: *Aronson v. Lewis*[62] and *Rales v. Blasband*.[63]  When conducting a

demand futility analysis under *Zuckerberg*, Delaware courts ask:

> (i) whether the director received a material personal benefit
> from the alleged misconduct that is the subject of the litigation
> demand;
>
> (ii) whether the director faces a substantial likelihood of
> liability on any of the claims that would be the subject of the
> litigation demand; and
>
> (iii) whether the director lacks independence from someone
> who received a material personal benefit from the alleged
> misconduct that would be the subject of the litigation demand
> or who would face a substantial likelihood of liability on any
> of the claims that are the subject of the litigation demand.[64]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand

board, then demand is excused as futile."[65]  While the *Zuckerberg* test displaced the prior

tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good

law.[66]

This court evaluates demand futility on a director-by-director basis, determining

whether a majority of the board of directors could consider a demand by "count[ing]

heads."[67]  Typically, the court would also run the analysis on a transaction-by-transaction

---

[62] 473 A.2d 805 (Del. 1984).

[63] 634 A.2d 927 (Del. 1993).

[64] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[65] *Id.*

[66] *Id.*

[67] *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016).

basis, assessing as to each challenged transaction whether the relevant "board lack[ed] a majority of directors who could exercise independent and disinterested judgment regarding a demand."[68]

In this case, one argument cuts through the director-by-director and transaction-by-transaction analysis. The parties agree that the relevant directors for the purpose of assessing demand futility as to all of the Compensation Counts were those on the Flashpoint board at the time the Amended Complaint was filed.[69] At that time, the board comprised Stanley, Bott, and Gregg. Defendants concede, as they must, that Stanley was interested in all the transactions challenged in the Compensation Counts. Because Plaintiffs have adequately alleged that Gregg lacked independence from Stanley, demand is futile as to each of the Compensation Counts.[70]

Rebutting the presumption of director independence in the demand futility context requires "facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[71] Delaware law "requires that all the pled facts regarding a director's relationship to the interested party be considered

---

[68] *Zuckerberg*, 250 A.3d at 877.

[69] Dkt. 90, ("Stanley Opening Br.") at 3; Dkt. 162 (Oral Arg. Tr.) at 64:1–2, 110:4–11, 114:7–11.

[70] Plaintiffs also argue that Bott too lacked independence from Stanley, and that both Bott and Gregg were interested in the transaction, but the court does not reach those issues because the first argument carries the day.

[71] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (quoting *Delaware Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015)).

in full context in making the, admittedly imprecise, pleading stage determination of independence."[72] In making the independence determination, the Court must "consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other."[73]

Doubts about a director's independence may arise "because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independently vis à vis an interested director."[74]

Plaintiffs allege that financial benefits and personal and business relationships make it reasonably conceivable that Gregg was incapable of impartially considering a demand to sue Stanley.

As to financial benefits, Plaintiffs allege that Gregg received undervalued Flashpoint stock that paid out $531,000 in dividends shortly after it was issued, director fees from two Stanley-affiliated companies, consulting fees from Flashpoint, and member benefits from Retro. The Amended Complaint does not specify the amount of fees received, but documents received by Plaintiffs through the Section 220 investigation indicate that Gregg received from Flashpoint $225,000 in director fees between 2007 and 2009. Gregg also received, from other entities affiliated with Stanley, a total of $350,000 in director fees, $237,000 in consulting fees, and $98,558 in "Interest on Consulting

---

[72] *Sanchez*, 124 A.3d at 1022.

[73] *Id.* at 1019; *In re EZCORP*, 2016 WL 301245, at \*34.

[74] *Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004).

25

Fees."[75]  All told, the allegations support an inference that Gregg has received over $1 million as a result of his relationship to Stanley.

As to personal and business relationships, Plaintiffs allege Gregg and Stanley have been business partners for about thirty years.  They live in the same small town of Peterborough, New Hampshire (population 6,284 in the 2010 census).  They have collaborated on civil interests, and together they were publicly credited with revitalizing Depot Square in downtown Peterborough.  They are honorary co-chairs of the Peterborough Town Library project.  They are co-members in at least five New Hampshire-based businesses formed to develop and manage local real estate and invest in local businesses, including a Peterborough restaurant.  Gregg has also invested in certain of Stanley's entities and has served on the board of one of those entities.[76]

---

[75] Dkt. 143, Ex. 52 at 16228 (stating that Gregg received $350,000 in "Director's Fees" and $98,558 in "Interest on Consulting Fees" from Fry affiliated entities); *id.* at 16237 (stating that Gregg received $237,000 from consulting fees in 2006, 2007, 2008, 2009 and 2010 from Fry affiliated entities); Dkt. 143, Ex. 53 at 5 (stating that Gregg received $225,000 in director's fees from Flashpoint between the third quarter of 2007 and the fourth quarter of 2009).

[76] Am. Compl. ¶ 23 ("Gregg has been Stan Fry's business partner in various businesses since the early 1990's, including as a co-member in five business entities: GBanersblock, LLC; Grove's End, LLC; Main and Grove, LLC; Waterhouse, LLC; and Our Town Capital, a business venture formed in September 2017 to invest in small businesses in New Hampshire. Gregg is also a member of Retro Reflective in which Stan Fry holds a financial interest and had been the Manager through at least March 2015, which operates out of the same office as Fry affiliate, Scenera Research. Gregg and Fry also have been Honorary Co-Chairs of the Peterborough Town Library project.").  Gregg's interest in Retro, Collision, and Flashpoint likely renders him sufficiently interested in the remaining aspects of Counts I through IV so as to render demand futile under either the first or second prong of the *Zuckerberg* test.

26

Generally, financial dealings between directors will not impugn a director's independence unless they are so material as to affect a director's impartiality.[77] Determining whether a director's financial ties are material requires a subjective examination of the individual director, thus "[t]he materiality inquiry must focus on the financial circumstances or personal affinities of the particular director in question."[78] That said, the bar for pleading materiality is not insurmountably high; Plaintiffs need not plead the dollar amount of a director's bank accounts, for example. Often, materiality (or a lack thereof) can be inferred from the size of the payment.

Also, generally, "[t]he naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."[79] The same is true of personal relationships. "[S]ome professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand[,]" but "without specific factual allegations"

[77] *See McElrath v. Kalanick*, 2019 WL 1430210, at *17 (Del. Ch. Apr. 1, 2019), *aff'd*, 224 A.3d 982 (Del. 2020) (holding that "a plaintiff must demonstrate 'ties [that] are material, in the sense that the alleged ties could have affected the impartiality of the director'" (citation omitted)).

[78] *Kalanick*, 2019 WL 1430210, at *17 (citation omitted).

[79] *Orman v. Cullman*, 794 A.2d 5, 26–27 (Del. Ch. 2002); *see also Owens v. Mayleben*, 2020 WL 748023, at *11 (Del. Ch. Feb. 13, 2020), *aff'd*, 241 A.3d 218 (Del. Oct. 29, 2020, corrected Nov. 18, 2020) (same); *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (holding that serving with a director on an unaffiliated company's board was insufficient to cast a reasonable doubt on the defendant's independence from that director); *Jacobs v. Yang*, 2004 WL 1728521, at *7 n.33 (Del. Ch. Aug. 2, 2004) (same).

27

those friendships are not enough to raise a reasonable inference of dependence.[80] "In order to establish lack of independence, the complaint must create a reasonable doubt that a director is so beholden to an interested director that his or her discretion would be sterilized."[81] "[T]he heightened strength of relationship required to" raise a reasonable doubt as to a director's independence "renders allegations concerning most ordinary relationships of limited value, at most."[82]

In recent years, the high court has urged a realistic approach to the independence analysis. In *Sandys v. Pincus*, the Delaware Supreme Court found reason to doubt a director's independence due to a relationship that was "suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment."[83] Building on this decision, in *Marchand v. Barnhill*, the high court observed that "our law has recognized that deep and longstanding friendships are meaningful to human beings and that any realistic consideration of the question of independence must give weight to these important relationships and their natural effect on the ability of the parties to act impartially toward each other."[84]

In this case, realistically speaking, there is reason to doubt Gregg's ability to impartially consider a demand to sue the co-champion of Peterborough, New Hampshire,

---

[80] *Beam*, 845 A.2d at 1050 (citation omitted).

[81] *Highland Legacy*, 2006 WL 741939, at *5.

[82] *Khanna v. McMinn*, 2006 WL 1388744, at *16 (Del. Ch. May 9, 2006).

[83] 152 A.3d at 130.

[84] 212 A.3d 805, 820 (Del. 2019).

who he has known and collaborated with for 30 years, and from whom he has (indirectly) derived over $1 million in financial benefits. Put differently, Plaintiffs' allegations concerning the financial benefits and close personal and business relationship, taken together, make it reasonably conceivable that Gregg could not impartially consider a demand to sue Stanley. Accordingly, Plaintiffs adequately allege facts sufficient to satisfy the third prong of *Zuckerberg*.

Defendants' motion to dismiss the Compensation Counts pursuant to Rule 23.1 is denied.[85]

## C. Failure To State A Claim

Defendants have moved to dismiss Counts V, VI, and VIII under Rule 12(b)(6). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[86] On a Rule 12(b)(6) motion, the court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[87] The court "is not, however, required to accept as true conclusory allegations without specific supporting factual allegations."[88] The court draws "all reasonable inferences in

---

[85] This conclusion could flow just as easily from the Plaintiffs' failure to satisfy the second prong as to certain Counts, given the outcome of the below Rule 12(b)(6) analyses. Because the allegations as to Gregg's lack of independence from Stanley renders demand futile as to all Counts, this decision forgoes analysis of the other *Zuckerberg* prongs.

[86] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[87] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[88] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (internal quotation marks omitted).

favor of the plaintiff, and den[ies] the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[89]

### 1. Count V For Breach Of Fiduciary Duties As To The Compensation Decisions

In Count V, Plaintiffs allege that directors and managerial employees of Flashpoint breached their duty of loyalty by "taking actions that favor their own interests over those of the Company and its shareholders[,]" and their duty of care by "wasting corporate assets [and] by giving undeserved or excessive bonuses."[90]

Plaintiffs allege that:

- Stanley was awarded $16,526,813 in bonuses from 2011 to 2013 and 2,220,000 shares at two cents per share in 2010;

- Ryan was awarded $1,562,699 in bonuses from 2010 to 2013, and 1,237,500 shares at two cents per share in 2010;

- Jared was awarded $2,145,196 in bonuses from 2010 to 2013 and 350,000 shares for two cents per share in 2010; and

- Gregg, Herrick, and Bott each received a bonus from 2008 to 2010 including 450,000 shares for two cents per share in 2010.

Plaintiffs allege that these decisions were made during Flashpoint board meetings between 2008 to 2013.

Defendants argue that the business judgment rule applies to the Compensation Decisions and that Plaintiffs failed to rebut the presumption that they were the product of

---

[89] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor*, 812 A.2d at 896–97).

[90] Am. Compl. ¶ 220.

valid business judgment.[91]  Plaintiffs respond that the entire fairness standard, and not the business judgement standard, governs this analysis.

To invoke the entire fairness standard, Plaintiffs must show "that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority."[92]  Successfully invoking the entire fairness standard "usually precludes granting a motion to dismiss."[93]

Where a board is evenly numbered, then a plaintiff only needs to show conflicts as to half of the board to invoke entire fairness.[94]  In this case, Stanley, Bott, Gregg, and Herrick comprised the Flashpoint board that approved the Compensation Decisions.  Thus, Plaintiffs must show that two of the four directors were conflicted with respect to those decisions.

Defendants concede that Stanley is an interested director with respect to the Compensation Decisions in Count V,[95] and this decision has already concluded that the Amended Complaint adequately alleges that Gregg lacks independence from Stanley.  Accordingly, Plaintiffs have carried their burden of rebutting the business judgment rule as to Count V.

---

[91] Stanley Opening Br. at 38.

[92] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017) (citing *Aronson*, 473 A.2d at 812).

[93] *Reith v. Lichtenstein*, 2019 WL 2714065, at *7 (Del. Ch. June 28, 2019).

[94] *See Frederick Hsu Living Tr.*, 2017 WL 1437308, at *26 (citing *Gentile v. Rossette*, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28, 2010)).  Defendants incorrectly state Plaintiffs' burden.  *See* Stanley Opening Br. at 38.

[95] *See* Stanley Opening Br. at 4, 26.

Consequently, Count V states a claim.

## 2. Count VI For Usurpation Of Corporate Opportunities

In Count VI, Plaintiffs claim that Defendants usurped Flashpoint's corporate opportunities through Collision, Concert, Retro, and Optical. This decision has already dismissed claims challenging the Collision and Concert opportunities in Counts I and II on grounds of standing. The analysis thus resolves the claims as to Retro and Optical.

In *Broz v. Cellular Information Systems, Inc.*, the Delaware Supreme Court established the four factors of a claim for usurpation of corporate opportunity:

> A corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[96]

The four *Broz* factors are merely "guidelines to be considered. No one factor is dispositive."[97]

Turning to the first factor, Plaintiffs argue that Flashpoint was financially able to exploit the Retro and Optical Opportunities.

As to Retro, Plaintiffs allege that Stanley negotiated a $3 million line of credit that Retro used to acquire the Retro Opportunity for $3 million.[98] Plaintiffs argue that Stanley

---

[96] 673 A.2d 148, 155 (Del. 1996) (citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (1939)).

[97] *Id.*

[98] Am. Compl. ¶¶ 141–42.

could have obtained this funding for Flashpoint and that Flashpoint would have been able to acquire the Retro Opportunity.[99] Defendants make a matter-of-fact argument in response, contending that there is more to buying patents than supplying the purchase price and that an entity must stand able to handle other aspects of the deal.[100] Defendants may prevail on this point ultimately, but it is a factually rife issue unsuited for resolution on the pleadings. Plaintiffs have a reasonably conceivable position, and at the motion to dismiss stage, competing inferences must be resolved in Plaintiffs' favor.

As to Optical, Plaintiffs argue that Flashpoint could have covered the $4.95 million price tag of the 2011 Optical Opportunity because Flashpoint (i) had enough cash on hand to pay out $19.3 million in cash bonuses in 2011 and (ii) had $24.8 million in cash and cash equivalents at the beginning of 2012.[101] Yet again, Defendants repeat the argument that there is more to acquiring patents than the purchase price, but fail to rebut the Plaintiffs' argument that Flashpoint had more than enough financial capacity to acquire the Optical Opportunity themselves. Plaintiffs cite to this court's decision in *Personal Touch Holding Corp. v. Glaubach*, where a company with $15 million in earnings was deemed financially able to complete a $2.4 million acquisition.[102] Here, Flashpoint's financial situation with $24 million in cash against the patents' acquisition price of nearly $5 million

---

[99] Pls.' Ans. Br. at 82–83.

[100] Defs.' Reply Br. at 68 ("But again, like Collision, [the Corporate Opportunities] required significant financing beyond purchase of the assets, including hired guns to prosecute costly litigation enforcement actions.").

[101] Pls.' Ans. Br. at 84.

[102] *See* 2019 WL 937180, at *14 (Del. Ch. Feb. 25, 2019).

lines up with the scenario described in *Personal Touch*. Accordingly, Plaintiffs have adequately alleged that Flashpoint possessed the financial capacity to pursue the Optical Opportunity.

Turning to the second factor, a company's line of business includes all activities where the company has "fundamental knowledge, practical experience and ability to pursue" provided that the activity is "consonant with its reasonable needs and aspirations for expansion."[103] The Delaware Supreme Court has cautioned that it would be "unsound" to conclude that a company has an interest in "any and every business opportunity that may come to any of its directors."[104] The term "line of business," however "has a flexible meaning, which is to be applied reasonably and sensibly to the facts and circumstances of the particular case."[105]

The parties dispute the scope of Flashpoint's line of business. Plaintiffs describe Flashpoint's line of business as "develop[ing] advanced technology solutions and intellectual property relating to the convergence of internet communications and digital content."[106] Defendants describe its line of business more narrowly as focusing on "digital still camera patents and technology."[107] For the purposes of a motion to dismiss, Plaintiffs' broader description of Flashpoint's line of business is reasonably conceivable.

---

[103] *Guth*, 5 A.2d at 514.

[104] *Johnston v. Greene*, 121 A.2d 919, 924 (1956).

[105] *Guth*, 5 A.2d at 514.

[106] Am. Compl. ¶ 26.

[107] *Id.* ¶ 1; Stanley Opening Br. at 47.

34

Drawing inferences in favor of Plaintiffs, the Retro and Optical Opportunities fall within Flashpoint's line of business, as they involves digital communication patents which would fall within Flashpoint's knowledge and experience in the fields of internet communications and digital content. Accordingly, Plaintiffs have adequately alleged facts that these opportunities fall within Flashpoint's line of business.

As to the third factor, in order for a company to have an "actual or expectant interest" in a corporate opportunity, "there must be some tie between that [opportunity] and the nature of the corporate business."[108]

For the Retro Opportunity, it is reasonably conceivable that Flashpoint is in the business of technology solutions for internet communications and digital content. It is also reasonably conceivable that the Retro Opportunity involves digital and internet telecommunication patents. It follows that there is at least some tie between the patents and the nature of Flashpoint's business. For the Optical Opportunity, the optical disc drive and related technology patents at least give rise to an inference of a tie to Flashpoint's business in digital content.

These allegations and reasonable inferences derived therefrom make it reasonably conceivable that Flashpoint had an interest or expectancy in the Retro and Optical Opportunities.

---

[108] *Greene*, 121 A.2d at 924 (citing *Guth*, 5 A.2d at 515).

As to the fourth factor, Plaintiffs must allege that Defendants' taking of a corporate opportunity placed them in a position "inimicable to his duties to the corporation."[109] Put differently, "the corporate opportunity doctrine is implicated only in cases where the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity."[110]

Defendants argue that Flashpoint did not lose any revenue to the Retro and Optical Opportunities.[111] Plaintiffs counter that it was the very creation of and investment in Retro and Optical that placed the Defendants at odds with the fiduciary duty they owed to Flashpoint.[112] Further, Plaintiffs contend that whether Flashpoint lost any profits is a matter of relief which is (i) immaterial to whether a corporate opportunity was taken, and (ii) not capable of being defined with precision prior to further discovery.[113]

Plaintiffs' position finds support in this court's precedents on corporate opportunities.[114] In *Dweck v. Nasser*, for example, the court found that the counterclaim-

---

[109] *Broz*, 673 A.2d at 155.

[110] *Id.* at 157.

[111] Stanley Opening Br. at 50; Defs.' Reply Br. at 67.

[112] Pls.' Ans. Br. at 91.

[113] *Id.* at 93.

[114] *See Dweck v. Nasser*, 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012) (fiduciaries who "used [the corporation's] personnel and resources" to pursue and appropriate corporate opportunity placed themselves "in a position inimicable to [their] duties to [the corporation]"); *In re Mobilactive Media, LLC*, 2013 WL 297950, at *23 (Del. Ch. Jan. 25, 2013) ("fiduciary [stood] in a position inimicable to his duties to the corporation" when acquiring competing companies for themselves instead of corporation).

defendants, the former President and CEO of the nominal defendant, breached their fiduciary duties by usurping corporate opportunities belonging to the company thereby diverting business and profits from the company.[115] The court found that the counterclaim-defendants had run "their [competing] businesses out of [the company's] premises, used [the company's] employees, and appropriated [the company's] resources."[116]

As in *Dweck*, Defendants took corporate opportunities that Flashpoint had the "financial capability to exploit" and created separate companies that in some cases used Flashpoint's personnel and resources.[117] Retro and Optical used Flashpoint's 20 Depot Street location.[118] There is also considerable overlap in the individuals who run Flashpoint and the other organizations, as Jared, Ryan, and Ramos hold some interest or position at Retro and Optical.[119] Consequently, Defendants were placed in a position inimicable to their duties to Flashpoint through the very act of seizing an opportunity that belonged to Flashpoint and by using Flashpoint personnel and resources to effect that seizure.

In sum, Plaintiffs have adequately alleged claims for usurpation of the Retro and Optical Opportunities. Each were corporate opportunities that were within Flashpoint's line of business, Flashpoint had an interest or expectancy in the opportunities, and Flashpoint had the financial capacity to take these opportunities for itself. By diverting

---

[115] 2012 WL 161590, at *12.

[116] *Id.*

[117] *See id.*

[118] Am. Compl. ¶ 109.

[119] *Id.* ¶¶ 19, 20, 50, 139, 143, 184; Dkt. 1, Ex. K.

these opportunities for themselves, Defendants put themselves in a position where their personal interests conflicted with the duty owed to Flashpoint.

Consequently, Count VI states a claim.

### 3. Count VIII For Unjust Enrichment

In Count VIII, Plaintiffs allege that Stanley, Herrick, Gregg, and Bott were unjustly enriched by the Challenged Transactions.[120] The claim seeks $26,320,958, which is the alleged sum of Stanley, Ryan, and Jared's bonuses and stock grants, and the Board's stock grant and dividend payments.[121]

To state a claim for unjust enrichment, the plaintiff must show, "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[122] "[I]f the [c]ourt dismisses a fiduciary duty claim for failure to state a claim, then it very likely also dismisses a duplicative unjust enrichment claim."[123]

Defendants first argue that the unjust enrichment claim fails because the underlying fiduciary duty and aiding and abetting claims fail.[124] Yet, when this court "does not dismiss a breach of fiduciary duty claim, it likely does not dismiss a duplicative unjust enrichment claim."[125] The motion to dismiss was denied as to the Compensation Decisions for

---

[120] Am. Compl. ¶¶ 249–58.

[121] *Id.* ¶¶ 251, 253, 255–58.

[122] *Nemec*, 991 A.2d at 1130.

[123] *Id.*

[124] Stanley Opening Br. at 44.

[125] *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014).

Defendants Stanley, Gregg, Bott, and Herrick.  Thus, there is a valid predicate for the unjust enrichment claims as to those Defendants.[126]

Defendants next argue that the Plaintiffs have failed to satisfy the fourth element of unjust enrichment—the absence of a justification.[127]  Specifically, Defendants argue that the Board approved both the bonus awards and the stock grants and "there is no well-pled factual allegation that the Frys did not earn those bonuses" or the stock grants.[128]

Typically, the absence of justification element "entails some type of wrongdoing or mistake at the time of the transfer."[129]  Here, Stanley, Herrick, Gregg, and Bott are alleged to have unjustly enriched themselves by giving each other bonuses and stock grants or knowingly participating in that decision.  Defendants argue these transactions were all justified, but at the pleading stage, the absence of an arms-length negotiated transaction and the allegation that Defendants were knowingly complicit in a breach of fiduciary duties owed to Flashpoint support finding that justification was absent.[130]

---

[126] *Nemec*, 991 A.2d at 1130 n.38 (noting "that 'it is axiomatic' that plaintiffs sufficiently pled allegations that defendants were unjustly enriched, having sufficiently pled allegations that defendants breached their fiduciary duty") (quoting *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999)).

[127] Defs.' Reply Br. at 58.

[128] *Id.*

[129] *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007) (citing *Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 673 (Del. Ch. 2006), *aff'd*, 956 A.2d 32 (Del. 2007)).

[130] *See Jacobs v. Meghji*, 2020 WL 5951410, at *14 (Del. Ch. Oct. 8, 2020).

Defendants' argument fails because Plaintiffs have pled sufficient facts to support an inference of wrongdoing on the part of the director Defendants through their fiduciary duty breach.

Consequently, Count VIII states a claim.

## III.   CONCLUSION

Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Defendants are entitled to summary judgment on the portions of Counts I, II, III, and IV that challenge actions that occurred before March 10, 2015; the motion for summary judgment is otherwise denied.  Defendants' motion to dismiss under Court of Chancery Rules 23.1 and 12(b)(6) is DENIED.